## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN D. BARTOS, | : | Civil No. 1:08-CV-0366 |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, DEPARTMENT | : | |
| OF ENVIRONMENTAL | : | (Chief Judge Kane) |
| PROTECTION; KATHLEEN A. | : | (Magistrate Judge Carlson) |
| MCGINTY, in her individual | : | |
| and official capacity; PATRICK | : | |
| MCDONNELL, in his individual | : | |
| and official capacity; And KENNETH | : | |
| R. REISINGER, in his individual | : | |
| and official capacity, | : | |
| Defendants | : | |

## MEMORANDUM OPINION AND ORDER

## I.      STATEMENT OF FACTS AND OF THE CASE

This case is an employment discrimination lawsuit brought by a former

employee of the Commonwealth of Pennsylvania, Department of Environmental

Protection. This matter comes before the Court on a Motion for Sanctions, (Doc. 36)

a motion which documented a disturbing and mendacious pattern of misconduct

1

allegedly undertaken by two state employees who were deposed as witnesses in the course of discovery in this case.[1]

The background of this tale of mendacity can be simply stated: On February 26, 2008 the Plaintiff, a former employee of the Pennsylvania Department of Environmental Protection (DEP) initiated this lawsuit by filing a complaint in federal court. (Doc. 1) In this complaint, Bartos alleged, in part, that he was suspended by DEP in August 2007, and later terminated by that agency in December 2007, in retaliation for reporting alleged waste and wrongdoing in the agency. (Id.)

While Bartos was employed at DEP his subordinates included the two individuals whose conduct is now at issue, Patricia Olenick and Donald Hagerich. As this litigation progressed, Olenick and Hagerich were identified by the parties as potential witnesses, who possessed information pertinent to Bartos' termination from the agency and the issues set forth in Bartos' complaint against DEP. (Doc. 12.) Accordingly, as part of the pre-trial discovery in this case, Bartos resolved to depose both Olenick and Hagerich.

---

[1]Pursuant to 28 U.S.C. § 636(b)(1)(A), this Court is authorized to rule upon attorney fee and sanctions disputes like those presented in this case. See, e.g., Merritt v. Int'l. Brotherhood of Boilermakers, 649 F.2d 1013 (5th Cir. 1981); Temple v. WISAP USA in Texas, 152 F.R.D. 591 (D.Neb. 1993).

Following the filing of this lawsuit, in January of 2009 Bartos secured employment with State Representative Todd Eachus, in the Pennsylvania House of Representatives, performing special projects at the direction of State Representative Robert Belfanti. Shortly after Bartos began work in Representative Eachus' office an ugly episode ensued. An anonymous letter was sent to Representative Eachus' office. That anonymous letter informed the Representative that Bartos had been disciplined for alleged misconduct while he was employed with DEP and attached a copy of a disciplinary letter that had been served on Bartos by DEP in December 2007.

In a case which involved claims by Bartos that he had been subjected to acts of retaliation by DEP officials, the sudden, anonymous appearance of this DEP disciplinary letter at the office of his current state employer had a potentially retaliatory aspect to it, and was a matter of immediate concern and relevance for the Plaintiff. Thus, the genesis of this anonymous letter became a topic of testimony in discovery depositions, including the depositions of Bartos' former DEP subordinates, Olenick and Hagerich.

Hagerich was deposed on June 10, 2009. Olenick, in turn, was deposed on June 23, 2009. In both of their depositions, Olenick and Hagerich were asked a series of questions regarding their knowledge of this anonymous letter and whether they had played any role in its preparation or surreptitious delivery to Bartos' current

employer. In response to this series of direct questions, Olenick and Hagerich repeatedly and explicitly denied under oath playing any role in the delivery of the letter, and disclaimed any knowledge of the letter.

These sworn statements are now acknowledged to have been lies. This deceit by these deponents did not come to light through some immediate and wholly voluntary disclosure by the witnesses. Quite the contrary, the sworn, but false, testimony of these witnesses remained uncorrected for three months, until September 2009.

The events which led to disclosure of this deceit began in September 2009, when Bartos noticed a deposition of the Chief of the Appeals Division of the State Civil Service Commission for September 30, 2009. Bartos noticed this deposition because the Plaintiff had determined that the disciplinary letter that was anonymously leaked to Representative Eachus had come from the Commission's files, and Bartos intended through the deposition to confirm how that letter made its way from these files to become an attachment on an anonymous letter.

In preparation for this defending this deposition, counsel for DEP met with the proposed deponent on or about September 17, 2009. At that time defense counsel received information which indicated that Olenick and Hagerich had retrieved the anonymous letter from state files shortly before it was delivered, raising the clear

inference that they had also participated in the submission of the anonymous letter, something they had repeatedly denied under oath in June, 2009.

Defense counsel acted promptly after learning this disturbing information and by September 24, 2009, the Defendants caused errata sheets to be filed by Olenick and Hagerich, errata sheets that attested to material and troubling changes in the sworn testimony of these two witnesses. Thus, for deponent Donald Hagerich, the proposed alterations in his prior sworn testimony regarding the provenance of the anonymous letter were profound, and completely altered the meaning of his prior testimony. These material changes are illustrated by following excerpt from that testimony where the original sworn answers are displayed in bold and the proposed errata are shown in italics:

> Q: Yes. Have you seen Page 1 of this exhibit [the anonymous letter and attachment] before?
> A: **In a newspaper article.** *I participated in its creation.*
>
> Q: I'm not asking you about the allegations contained in this. I'm asking you if you've ever seen this piece of paper before.
> A: **No**. *Yes*
>
> Q: Did you play a role in the preparation of this letter?
> A: **No**. *Yes*
>
> Q: Are you aware of anybody at DEP who played a role in the preparation of this letter?
> A: **Nope**. *Yes*

Q: Are you aware of anybody who has played a role in the preparation of this letter?
A: **Nope**. *Yes*

Q: I want to turn your attention to Page 2. Have you seen Page 2 before today?
A; **No**. *Yes*

Q: I want to turn your attention to Page 3 of this exhibit. Have you seen this page before today?
A: **No**. *Yes*

Q: I want you to turn to the last page of this exhibit. .... Did you prepare this envelope?
A : This paper?
Q: The envelope.

MR. GOLDBERG: This is a photocopy of an envelope.
A: Oh.

BY MR. CLARK:
Q: Did you prepare the envelope?
A: **No**. *Yes*

Q: Did you play a role in the preparation of the envelope?
A: **No**. *Yes*

Q: Have you ever been in the offices of the State Civil Service Commission?
A: Yes
.
Q: When?
A: I probably started going there in 1978.

Q: When is the last time you were in their offices?
A: I don't recall. It's been quite awhile.

Q: Was it more than a year ago?
A: Yes.

Q: Was it more than two years ago?
A: **Yes**. *No*

Q: Have you been to the State Civil Service Commission offices to obtain a photocopy of the discharge letter that was issued to Mr. Bartos?
A: **No**. *Yes*

Q: Did you accompany anybody who went to the State Civil Service Commission offices in order to obtain a copy of the discharge letter of Mr. Bartos?
A: **No**. *Yes*

Q: Did you accompany anybody who was at the State Civil Service Commission offices for the purpose of reviewing Mr. Bartos's Civil Service Commission file?
A: **No**. *Yes*

Similarly the proposed errata sheet submitted by Patricia Olenick revealed her prior sworn testimony on the issue of the genesis of this anonymous letter to be a fabric of lies, as illustrated by the following excerpt from that testimony where the original sworn answers are displayed in bold and the proposed errata are shown in italics:

Q: Turn to page two of this exhibit. Actually, pages two and three. I'll represent to you this is the discharge letter Mr. Bartos received in December of 2007. Did you see this letter before today?
A: **No.** *Yes*

Q: Did you obtain a copy of this letter from the State Civil Service Commission?
A: **No**. *Yes*

Q: Did you accompany anybody who obtained a copy of this letter from the State Civil Service Commission?
A: **No.** *Yes*

Q: Did you accompany anybody who reviewed the State Civil Service Commission records –
A: **No.** *Yes*

Q: I didn't finish my question. Did you accompany anybody who reviewed the State Civil Service Commission records pertaining to Steve Bartos?
A: **No**. *Yes*

Q: Have you made a request for any information from Steve Bartos' Civil Service Commission file?
A: **No**. *Yes*

 Confronted with this belated acknowledgment of a significant pattern of calculated falsehoods by these two witnesses, Bartos moved to strike the errata sheets, and also moved for sanctions. The Court authorized discovery to allow the parties to get to the truth behind these lies, and permitted briefing on the issue of whether this misconduct permitted the Court to impose sanctions.

This matter has been fully briefed by the parties, and the witnesses, (Docs. 36, 47, 48, 50, 52, 53, 54, 57, 76, 81, 83 and 86) and is now ripe for resolution. For his part, Bartos contends that he should be able to pursue sanctions against these non-party deponents for their false testimony and urges the Court to consider the following potential array of sanctions:

-That Mr. Hagerich and Ms. Olenick reimburse Bartos' subsequent costs, including attorneys fees, incurred as a result of conducting follow-up depositions of Mr. Hagerich and Ms. Olenick;

-That Mr. Hagerich and Ms. Olenick reimburse Bartos' costs, including attorney fees, incurred in bringing the Motion and these proceedings;

-That Mr. Hagerich and Ms. Olenick be barred from receiving any compensation or reimbursement, directly or indirectly, for indemnification or payment of any costs or expenses. This provision will expressly bar Mr. Hagerich and Ms. Olenick and/or their counsel from receiving reimbursement through 42 Pa.C.S. §8525, 4 Pa. Code §§39.1-6, 4 Pa. Code §§39.11-14, Management Directive 205.6, or any other statute, regulation or directive pertaining to indemnification or reimbursement of Commonwealth employees of any costs or expenses relating to these proceedings. (Doc. 57).[2]

Olenick and Hagerich, in turn, oppose these requests for sanctions, arguing that imposition of these sanctions may fall beyond the power of this Court to sanction non-party witnesses, and further contending that the proper exercise of discretion in this case calls for mitigation of sanctions, or the imposition of no sanctions whatsoever. (Id.)

For the reasons set forth below, the Motion for Sanctions will be granted, in part, and the Plaintiff will be directed to submit a declaration and brief detailing his

---

[2]Bartos also sought leave to further depose these witnesses, which was granted by the Court.

costs and fees incurred in the course of litigating this matter and further deposing these two witnesses.

## II.  **DISCUSSION**

Despite some suggestion by Olenick and Hagerich to the contrary, the power of this Court to sanction misconduct by witnesses and non-party deponents in civil cases is beyond any serious dispute.  Indeed, the inherent power of the Court to act in this area and address misconduct which is antithetical to the search for the truth has long been recognized by the United States Supreme Court, which has held that:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson,* 7 Cranch 32, 34, 3 L.Ed. 259 (1812); see also *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson* ). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); see also *Ex parte Robinson,* 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).

*Chambers v. NASCO, Inc*. 501 U.S. 32, 43 (1991).

Thus, it is well-settled that:

> [A] court may assess attorney's fees when a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order". The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy."

*Id.* at 45-46 (citations omitted).

The Court's power to act in this field has long been recognized as an essential component of the Court's indispensable role as a instrument of the truth. Therefore, the ability to sanction misconduct historically is tied to the need to vindicate the basic, fundamental obligation of all those who come before the Court to tell the truth. As the United States Court of Appeals for the Third Circuit has aptly observed:

> Our legal system will endure only so long as members of society continue to believe that our courts endeavor to provide untainted, unbiased forums in which justice may be found and done. Thus, it is beyond peradventure that district courts have broad authority to preserve and protect their essential functions. To ensure that district courts have tools available to protect their truth-seeking process, the Federal Rules of Civil Procedure allow district courts to sanction parties who fail to

meet minimum standards of conduct in many different contexts. *E.g.,* Fed.R.Civ.P. 11 (groundless pleadings and other papers); 16(f) (failing to abide by pretrial orders); 26(g), 30(g), 37(d), and 37(g) (discovery abuses); 41(b) (involuntary dismissal for failure to prosecute, failure to follow rules, or failure to obey court order); 45(f) (disobeying subpoena); 56(g) (providing affidavit at summary judgment in bad faith or for delay). Congress has also enacted laws providing additional powers to district courts to police misconduct. *E.g.,* 18 U.S.C. § 401 (contempt power); 28 U.S.C. § 1927 (punishing attorneys who vexatiously multiply proceedings). *See generally Chambers v. NASCO, Inc.,* 501 U.S. 32, 62-63, 111 S.Ct. 2123, 2142, 115 L.Ed.2d 27 (1991) (Kennedy, J., dissenting) (listing sources of sanctioning authority).

*Republic of Philippines v. Westinghouse Elec. Corp*. 43 F.3d 65, 73 (3d. Cir. 1994)

It is also beyond serious dispute that this power extends, not only to parties in civil litigation, but also to other persons, such as witnesses, who may be embroiled in that litigation. *See, e.g., General Ins. Co. Of America v. Eastern Consolidated Utilities, Inc*., 126 F.3d 215 (3d Cir. 1997); *In re Intel Corp. Microprocessor Antitrust Litigation*, 562 F.Supp.2d. 606 (D.Del.. 2008); *Pafumi v. Davidson*, No. 05-61679, 2008 WL 4084418 (M.D. Fla. Sep. 3, 2008); *Helmac Products Corporation v. Roth Corporation*, 150 F.R.D. 563 (E.D. Mich. 1993). Moreover, sanctionable misconduct by these non-party witnesses can take many forms, including: failures to appear, *General Ins. Co. Of America v. Eastern Consolidated Utilities, Inc*., *supra*; destruction of evidence; *Helmac Products Corporation v. Roth Corporation*, *supra*; or giving false, misleading and materially incomplete testimony. *Black Horse Lane*

*Assoc., LP v. Dow Chemical Corp.*, 228 F.3d 275, 300-305 (3d. Cir. 2000). In all of its varied forms, this misconduct by non-parties and witnesses may, and properly should, be the subject of sanctions. *Id.*

Thus, the power of the Court to impose sanctions in discovery matters is undisputed, and the exercise of that authority rests in the sound discretion of the Court. *See Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987). Accordingly, a Court's decisions regarding the conduct of discovery will be disturbed only upon a showing of an abuse of discretion. *Marroquin-Manriquez v. I.N.S.*, 699 F.2d 129, 134 (3d Cir. 1983). That discretion is guided, however, by certain basic principles. Foremost among these principles is the basic tenet that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court. *See, Klein v. Stahl, GMBH & Co., Maschinefabrik*, 185 F.3d 98 (3d. Cir. 1999).This basic, but pivotal, aspect of the exercise of discretion in this area, has been voiced in many ways. Thus, it is well established that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.* 501 U.S. at 44-45 (citation omitted). Therefore, in exercising this authority we are cautioned that:

[A] district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified. In exercising its discretion under its inherent powers, the court should be guided by the same considerations that guide it in the imposition of sanctions under the Federal Rules. First, the court must consider the conduct at issue and explain why the conduct warrants sanction.

*Republic of Philippines v. Westinghouse Elec. Corp*. 43 F.3d at 74.

Moreover:

[H]aving evaluated the conduct at issue, the district court must specifically consider the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate. Although the court need not "exhaust all other sanctioning mechanisms prior to resorting to its inherent power" (*Landon v. Hunt,* 938 F.2d at 450, 454 (3d Cir.1991)), the court must explain why it has chosen any particular sanction from the range of alternatives it has identified. *See Poulis,* 747 F.2d at 868 (sanctions under Fed.R.Civ.P. 16 and 37).

*Id.*

In practice, therefore, courts are enjoined to consider a wide range of factors when determining whether, and how, to impose sanctions. Thus:

When exercising discretion under its inherent sanction powers, a court is guided by the considerations set forth in the Federal Rules of Civil Procedure. *Westinghouse,* 43 F.3d at 74. Factors to consider include:

1. The nature and quality of the conduct at issue;

2. Whether the attorney or the client is responsible for the culpable conduct;

3. Whether there was a pattern of wrongdoing requiring a stiffer sanction;

4. The sanctioned party's ability to pay;

5. Whether the wrongdoing actually prejudiced the wrongdoer's opponent or hindered the administration of justice; and,

6. The existence of mitigating factors.

*In re Intel Corp. Microprocessor Antitrust Litigation* 562 F.Supp.2d at 611. In addition, when considering the imposition of sanctions on a non-party witness or deponent, "[t]o be subject to the Court's inherent power to sanction, a non-party not subject to court order must (1) have a substantial interest in the outcome of the litigation; and, (2) substantially participate in the proceedings in which he interfered. This test will effectively limit the scope of the Court's inherent power to sanction to those individuals who were either (1) parties, (2) subject to a court order, or, (3) real parties in interest." *Helmac Products Corp. v. Roth Plastics Corp.* 150 F.R.D. at 568.

The parties have fully briefed the application of these basic principles to our exercise of discretion in this matter. Upon a consideration of these briefs, and the compelling facts of this case, we conclude that specific, narrowly-tailored financial sanctions are warranted here against both Olenick and Hagerich. Indeed, we find that such sanctions are the least severe remedy that is appropriate in this case given the gravity of this misconduct, and the direct litigation costs which this misconduct improperly imposed upon the Plaintiff.

In reaching this conclusion we find, at the outset, that these witnesses meet the description of the type of witnesses who should be subject to the sanctions power of the Court since they have demonstrated that they are persons with a substantial interest in the outcome of the litigation who have substantially participated in the proceedings in which the interference took place. In this regard, we initially note that these witnesses were identified by the parties as material witnesses in this matter, whose testimony related to Bartos' conduct in the workplace, and might potentially justify the actions taken by the Defendants here.

The significant stake that Olenick and Hagerich perceived themselves as having in this employment litigation is then powerfully underscored by their actions. These witnesses felt compelled to obtain state records relating to disciplinary actions taken against Bartos, and anonymously forward those records to Bartos' current state employers. These actions speak eloquently to the direct, substantial and personal interests that these two witnesses had in matters relating to Bartos' state employment. Moreover, by compounding their decision to create and send this letter with a decision to lie under oath about this activity during depositions conducted in this litigation, Olenick and Hagerich amply demonstrated that they also substantially participated in these proceedings in which this interference with the search for the

truth took place. Thus, the threshold requirements for non-party sanctions liability are fully met here.

Furthermore, when we consider the nature and quality of the conduct at issue in this case, we find that the gravity of this misconduct cannot be overstated. These state employees engaged in a shabby, anonymous exercise designed to secretly harm the employment prospects of a former co-worker who was suing the state for employment discrimination. These state employees took this action, while being presented as witnesses in this underlying federal employment discrimination case, and then deliberately and repeatedly lied about their actions, causing cost and delay in these proceedings. While Olenick and Hagerich ultimately admitted to this deception, they did so only after they learned that Bartos knew, or would soon learn of their misconduct. Thus, the errata sheets tendered by Olenick and Hagerich do not excuse this misconduct, they simply memorialize that misconduct since the witnesses belatedly admitted to a series of calculated falsehoods only after it was apparent that Bartos would discover their misdeeds. Further, these deliberate deceits concerned the witnesses' roles in creating and mailing an anonymous letter to Bartos' employer in February 2009. Nothing about the facts surrounding this tawdry exercise was new to Olenick and Hagerich when they testified falsely, and the only new evidence that existed in September 2009, when these errata were belatedly tendered to the Court,

was the "fact" that the witnesses had been caught in the web of deceit which they had cast months earlier.

In an effort to avoid or minimize these sanctions, Olenick and Hagerich contend that Bartos has not been prejudiced by their actions, and further argue what they claim is a mitigating factor in their favor–their alleged fear of Bartos. Yet, in our view, neither of these excuses justifies foregoing sanctions in this case. At the outset, to the extent that the witnesses cite a fear of Bartos as a mitigating factor, we find that their fears do not excuse or explain their actions. Indeed, the conduct of these witnesses in seeking out, obtaining, and anonymously disseminating adverse employment information relating to Bartos cannot be explained or justified solely as a product of fear. Fear would presumably cause the witnesses to avoid Bartos; it would not necessarily cause one to try to secretly harm or destroy him. Thus, while we can accept that the false testimony of these witnesses may have been motivated, in part, by fear of discovery, their underlying conduct in attempting to secretly disparage Bartos speaks to other, base motives–anger, envy and spite as well as fear.

We also find that Bartos was prejudiced by these actions. Bartos was potentially prejudiced in his employment, but more fundamentally he was prejudiced in this litigation as he was compelled to expend time, expense and effort to ferret out who was responsible for this act. Moreover, at all times, Olenick and Hagerich could

have completely avoided this litigation prejudice to Bartos through the simple expedient of obeying to the oath they took as witnesses to tell the truth.

Given the prejudice which we find here, and the lack of sufficient mitigation to warrant foregoing sanctions, we believe that some sanctions are appropriate in this case. In fashioning those sanctions we remain mindful, however, that the sanctions should be narrowly tailored to the specific misconduct, and any sanctions decision should take into account the ability of the sanctioned party to pay. Therefore, in this case, subject to a finding regarding the ability of the witnesses to pay, we will grant the motion for sanctions, and put the parties on notice that we intend to impose sanctions in the form of an order directing:

> -That Hagerich and Olenick reimburse Bartos' costs, including attorneys fees, incurred as a result of conducting follow-up depositions of Mr. Hagerich and Ms. Olenick; and,
>
> -That Mr. Hagerich and Ms. Olenick reimburse Bartos' costs, including attorney fees, incurred in bringing the Motion and these proceedings.[3]

---

[3]In his motion Bartos also requested that Hagerich and Olenick be barred from receiving any compensation or reimbursement, directly or indirectly, for indemnification or payment of any costs or expenses, in order to expressly bar Mr. Hagerich and Ms. Olenick and/or their counsel from receiving reimbursement through 42 Pa.C.S. §8525, 4 Pa. Code §§39.1-6, 4 Pa. Code §§39.11-14, Management Directive 205.6, or any other statute, regulation or directive pertaining to indemnification. Mindful of the fact that our sanction should be narrowly tailored, we will decline this invitation, but will direct that the Commonwealth disclose to the Plaintiff any reimbursements which it makes in connection with this matter, so that the Plaintiff can argue the evidentiary

In our view, such sanctions are the most narrowly tailored remedies available to address this misconduct, misconduct that was profound and reflected a fundamental disregard for the truth. However, in order to ensure that the sanction is narrowly drawn to fit this misconduct, we will direct the Plaintiff to submit an itemized listing of those costs and fees that he believes are directly associated with the depositions of Olenick and Hagerich, as well as the costs of litigating these motions, and a memorandum of law in support of these requested costs and fees. We will then afford the witnesses an opportunity to lodge appropriate objections to any claimed costs and fees, and to provide any information which they possess that may be relevant to a determination of their ability to pay narrowly tailored costs and fees.

## III. <u>CONCLUSION</u>

Accordingly, for the foregoing reasons Bartos' Motion for Sanctions (Doc.36) is GRANTED. The Plaintiff is ordered to submit an itemized listing of those costs and fees that he believes are directly associated with the depositions of Olenick and Hagerich, as well as the costs of litigating these motions, and a memorandum of law in support of these requested costs and fees on or before **May 19, 2010.** The witnesses shall then lodge appropriate objections to any claimed costs and fees, and to provide any information which they possess that may be relevant to a

---

relevance of these reimbursements.

determination of their ability to pay costs and fees, and an accompanying brief, on or before **June 2, 2010.** The Plaintiff may then file a reply brief in support of this motion and request on or before **June 16, 2010.**

So ordered this 5th day of May, 2010.

***S/Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge