## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHEN D. BARTOS,** | : | **Civil No. 1:08-CV-0366** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, DEPARTMENT** | : | |
| **OF ENVIRONMENTAL** | : | **(Chief Judge Kane)** |
| **PROTECTION; KATHLEEN A.** | : | **(Magistrate Judge Carlson)** |
| **MCGINTY, in her individual** | : | |
| **and official capacity; PATRICK** | : | |
| **MCDONNELL, in his individual** | : | |
| **and official capacity; And KENNETH** | : | |
| **R. REISINGER, in his individual** | : | |
| **and official capacity,** | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION AND ORDER

### I.    Statement of Facts and of The Case

This case is an employment discrimination lawsuit brought by a former

employee of the Commonwealth of Pennsylvania, Department of Environmental

Protection. This matter now comes before the Court for the purpose of assessing the

proper measure of sanctions on motions for sanctions, and attorney's fees, filed by the

Plaintiff, (Docs. 36 and 89) motions which document a pattern of misconduct

undertaken by two state employees who were deposed as witnesses in the course of discovery in this case.[1]

The background of this matter can be simply stated: On February 26, 2008 the Plaintiff, a former employee of the Pennsylvania Department of Environmental Protection (DEP) initiated this lawsuit by filing a complaint in federal court. (Doc. 1) In this complaint, Bartos alleged, in part, that he was suspended by DEP in August 2007, and later terminated by that agency in December 2007, in retaliation for reporting alleged waste and wrongdoing in the agency. (Id.)

While Bartos was employed at DEP his subordinates included the two individuals whose conduct is now at issue in these sanctions proceedings, Patricia Olenick and Donald Hagerich. As this litigation progressed, Olenick and Hagerich were identified by the parties as potential witnesses, who possessed information pertinent to Bartos' termination from the agency and the issues set forth in Bartos' complaint against DEP. (Doc. 12.) Accordingly, as part of the pre-trial discovery in this case, Bartos resolved to depose both Olenick and Hagerich.

---

[1]Pursuant to 28 U.S.C. § 636(b)(1)(A), this Court is authorized to rule upon attorney fee and sanctions disputes like those presented in this case. See, e.g., Merritt v. Int'l. Brotherhood of Boilermakers, 649 F.2d 1013 (5th Cir. 1981); Temple v. WISAP USA in Texas, 152 F.R.D. 591 (D.Neb. 1993).

Following the filing of this lawsuit, in January of 2009 Bartos secured employment with State Representative Todd Eachus, in the Pennsylvania House of Representatives, performing special projects at the direction of State Representative Robert Belfanti. Shortly after Bartos began work in Representative Eachus' office an ugly episode ensued. An anonymous letter was sent to Representative Eachus' office. That anonymous letter informed the Representative that Bartos had been disciplined for alleged misconduct while he was employed with DEP and attached a copy of a disciplinary letter that had been served on Bartos by DEP in December 2007.

In a case which involved claims by Bartos that he had been subjected to acts of retaliation by DEP officials, the sudden, anonymous appearance of this DEP disciplinary letter at the office of his current state employer had a potentially retaliatory aspect to it, and was a matter of immediate concern and relevance for the Plaintiff. Thus, the genesis of this anonymous letter became a topic of testimony in discovery depositions, including the depositions of Bartos' former DEP subordinates, Olenick and Hagerich.

Hagerich was deposed on June 10, 2009. Olenick, in turn, was deposed on June 23, 2009. In both of their depositions, Olenick and Hagerich were asked a series of questions regarding their knowledge of this anonymous letter and whether they had played any role in its preparation or surreptitious delivery to Bartos' current

employer. In response to this series of direct questions, Olenick and Hagerich repeatedly and explicitly denied under oath playing any role in the delivery of the letter, and disclaimed any knowledge of the letter.

These sworn statements are now acknowledged to have been lies. This deceit by these deponents did not come to light through some immediate and wholly voluntary disclosure by the witnesses. Quite the contrary, the sworn, but false, testimony of these witnesses remained uncorrected for three months, until September 2009.

The events which led to disclosure of this deceit began in September 2009, when Bartos noticed a deposition of the chief of the Appeals Division of the State Civil Service Commission for September 30, 2009. Bartos noticed this deposition because the Plaintiff had determined that the disciplinary letter that was anonymously leaked to Representative Eachus had come from the Commission's files, and Bartos intended through the deposition to confirm how that letter made its way from these files to become an attachment to an anonymous letter.

In preparation for defending this deposition, counsel for DEP met with the proposed deponent on or about September 17, 2009. At that time defense counsel received information which indicated that Olenick and Hagerich had retrieved the anonymous letter from state files shortly before it was delivered, raising the clear

inference that they had also participated in the submission of the anonymous letter, something they had repeatedly denied under oath in June, 2009.

Defense counsel acted promptly after learning this disturbing information and by September 24, 2009, the Defendants caused errata sheets to be filed by Olenick and Hagerich, errata sheets that attested to material and troubling changes in the sworn testimony of these two witnesses. Thus, for deponent Donald Hagerich, the proposed alterations in his prior sworn testimony regarding the provenance of the anonymous letter were profound, and completely altered the meaning of his prior testimony. These material changes are starkly illustrated by following excerpt from that testimony where the original sworn answers are displayed in bold and the proposed errata are shown in italics:

Q: Yes. Have you seen Page 1 of this exhibit [the anonymous letter and attachment] before?
A: **In a newspaper article.** *I participated in its creation.*

Q: I'm not asking you about the allegations contained in this. I'm asking you if you've ever seen this piece of paper before.
A: **No**. *Yes*

Q: Did you play a role in the preparation of this letter?
A: **No**. *Yes*

Q: Are you aware of anybody at DEP who played a role in the preparation of this letter?
A: **Nope**. *Yes*

Q: Are you aware of anybody who has played a  role in the preparation of this letter?
A:  **Nope**. *Yes*

Q: I want to turn your attention to Page 2. Have you seen Page 2 before today?
A;  **No**. *Yes*

Q: I want to turn your attention to Page 3 of this exhibit. Have you seen this page before today?
A:  **No**. *Yes*

Q: I want you to turn to the last page of this exhibit. .... Did you prepare this envelope?
 A : This paper?
 Q:  The envelope.

 MR. GOLDBERG: This is a photocopy of an envelope.
 A: Oh.

 BY MR. CLARK:
Q: Did you prepare the envelope?
A:  **No**. *Yes*

Q: Did you play a role in the preparation of the envelope?
A:  **No**. *Yes*

Q: Have you ever been in the offices of the  State Civil Service Commission?
A: Yes
.
Q: When?
A: I probably started going there in 1978.

Q: When is the last time you were in their offices?
A: I don't recall. It's been quite awhile.

Q: Was it more than a year ago?
A: Yes.

Q: Was it more than two years ago?
A: **Yes**. *No*

Q: Have you been to the State Civil Service Commission offices to obtain a photocopy of the discharge letter that was issued to Mr. Bartos?
A: **No**. *Yes*

Q: Did you accompany anybody who went to the State Civil Service Commission offices in order to obtain a copy of the discharge letter of Mr. Bartos?
A: **No**. *Yes*

Q: Did you accompany anybody who was at the State Civil Service Commission offices for the purpose of reviewing Mr. Bartos's Civil Service Commission file?
A: **No**. *Yes*

Similarly the proposed errata sheet submitted by Patricia Olenick revealed her prior sworn testimony on the issue of the genesis of this anonymous letter to be a fabric of lies, as illustrated by the following excerpt from that testimony where the original sworn answers are displayed in bold and the proposed errata are shown in italics:

Q: Turn to page two of this exhibit. Actually, pages two and three. I'll represent to you this is the discharge letter Mr. Bartos received in December of 2007. Did you see this letter before today?
A: **No.** *Yes*

Q: Did you obtain a copy of this letter from the State Civil Service Commission?
A: **No**. *Yes*

Q: Did you accompany anybody who obtained a copy of this letter from the State Civil Service Commission?
A: **No.** *Yes*

Q: Did you accompany anybody who reviewed the State Civil Service Commission records –
A: **No.** *Yes*

Q: I didn't finish my question. Did you accompany anybody who reviewed the State Civil Service Commission records pertaining to Steve Bartos?
A: **No**. *Yes*

Q: Have you made a request for any information from Steve Bartos' Civil Service Commission file?
A: **No**. *Yes*

 Confronted with this belated acknowledgment of a pattern of calculated falsehoods by these two witnesses, Bartos moved to strike the errata sheets, and also moved for sanctions. Bartos also sought and obtained leave to further depose Olenick and Hagerich, as well as another witness, Mark Vottero. Following this additional discovery, the sanctions motion and motion to strike were fully briefed by the parties, and the witnesses, (Docs. 36, 47, 48, 50, 52, 53, 54, 57, 76, 81, 83, and 86), and were resolved by this Court in opinions entered on April 23, 2010 (Doc. 87) and May 5, 2010. (Doc.88.)

With respect to Bartos' Motion for Sanctions, in our May 5 opinion and order we concluded that this misconduct by Olenick and Hagerich was sufficiently grave

that it warranted imposition of monetary sanctions and put the parties on notice that

we intended to impose sanctions in the form of an order directing:

> -Hagerich and Olenick to reimburse Bartos' costs, including attorneys fees, incurred as a result of conducting follow-up depositions of Mr. Hagerich and Ms. Olenick; and

> -Requiring Mr. Hagerich and Ms. Olenick to reimburse Bartos' costs, including attorney fees, incurred in these sanction proceedings.

In our view, such sanctions were the most narrowly tailored remedies available to

address this misconduct, misconduct that was profound and reflected a fundamental

disregard for the truth. However, in order to ensure that any sanction was narrowly

drawn to fit this misconduct, we directed the Plaintiff to submit an itemized listing

of those costs and fees that he believes are directly associated with the depositions of

Olenick and Hagerich, as well as the costs of litigating these motions, and a

memorandum of law in support of these requested costs and fees. We then provided

Olenick and Hagerich the opportunity to lodge objections to any of the costs and fees

claimed by Bartos.(Id.)

The parties have now completed the process of briefing the proper measure of

sanctions in this case. (Docs. 89, 90, 97, 98, 99, and 100.) For his part, Bartos has

claimed fees and costs totaling $32,271.67. These costs and fees consist of the

following items: (1) attorney's fees for 84.0 hours of legal work, as to which Bartos seeks reimbursement at a rate of $350 per hour; (2)fees for an 9.5 hours of paralegal work, as to which Bartos seeks reimbursement at a rate of $100 per hour; and (3) an additional $1,921.67 in litigation costs for Bartos and his counsel. (Docs. 89 and 90.)

For their part, Olenick and Hagerich, who are now proceeding *pro se*,[2] have lodged two specific, and one general objection to the costs and fees claimed by Bartos. (Docs. 97 and 98.) In particular, Olenick and Hagerich argue: (1) that the $350 per hour attorney fee rate claimed by Bartos is excessive given Bartos' counsel candid admission that he is only billing Bartos $200 per hour for this legal work; and (2) that the costs and expenses relating to the deposition of one witness, Mark Vottero, be disallowed since Vottero's deposition testimony did not relate solely to issues involving the sanctions motion. (Id.) Olenick and Hagerich then urge the Court as a general matter to mitigate these sanctions, asserting that they lack the resources to pay the full amount of the more than $32,000 in costs and fees claimed by Bartos.

---

[2]Initially, Olenick and Hagerich were represented by counsel in this matter. Consistent with state practice, at the outset of these proceedings, the Commonwealth reimbursed its employees' counsel fees in connection with this sanction litigation. Upon this Court's finding of misconduct by these witnesses, the Commonwealth ceased reimbursing these fees, counsel withdrew, and these witnesses are now proceeding *pro se.* (Docs. 91-96.)

This matter has now been fully briefed by the parties (Docs. 89, 90, 97, 98, 99, and 100), and is ripe for resolution. For the reasons set forth below, Bartos' motion for costs and fees (Doc. 89), will be GRANTED in part.

## II.  **Discussion**

### (A)  **Legal Standards Governing Attorney's Fee Calculations as Sanctions**

"The starting point for a determination of attorney's fees, the lodestar calculation, is the product of the number of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate." Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 195 (3d Cir. 1988); see also Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). The party seeking fees bears the burden of producing "sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered . . . ." Knight v. Drye, 2009 U.S. Dist. LEXIS 82369 (M.D. Pa. Sept. 10, 2009) (quoting McCutcheon v. America's Servicing Co., 560 F.2d 143, 150 (3d Cir. 1990). See also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 564 (1986) (party seeking fees has the initial burden of presenting evidence that the claimed rates and time expended are reasonable).

In the more familiar setting of fee-shifting awards, the Third Circuit has instructed that determining a reasonable hourly rate generally "is calculated according to the prevailing market rates in the relevant community." Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 180 (3d Cir. 2001); see also Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 705 (3d Cir. 2005) (in most cases, the relevant market rate is the prevailing rate in the forum of the litigation). A court must not make a finding of reasonableness based on its own "generalized sense" of appropriateness, but instead "must rely on the record." Evans v. Port Auth. of N.Y. and N.J., 273 F.3d 346, 361 (3d Cir. 2001) (quoting Smith v. City of Phila. Housing Auth., 107 F.3d 223, 225 (3d Cir. 1997)). Courts are to "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001); Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990). The party seeking fees "bears the burden of establishing by way of satisfactory evidence, 'in addition to [the] attorney's own affidavits,' . . . that the requested hourly rates meet this standard." Washington v. Philadelphia Cty. Ct. of Common Pleas, 89 F.3d 1031, 1035 (3d Cir. 1996) (citing Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)). The petitioning attorney's usual billing rate is typically a starting point in this calculation,

but it is not dispositive. <u>Loughner</u>, 260 F.3d at 180. Although the petitioning party has the burden of demonstrating that the requested hourly rates are reasonable, where the party opposing the asserted rate "has not produced contradictory evidence, the district court may not exercise its discretion to adjust the requested rate downward." <u>Ridley v. Costco Wholesale Corp.</u>, 217 F. App'x 130 (3d Cir. 2007) (quoting <u>Washington</u>, 89 F.3d at 1036)); <u>see also</u> <u>Black Grievance Committee v. Philadelphia Elec. Co.</u>, 802 F.2d 648, 652-53 (district court not free to disregard attorney's affidavit regarding reasonableness of hourly rate where the opposing party "filed no affidavit and offered no testimony contesting the accuracy of [the attorney's] statement with respect to charges by comparable practitioners").

With respect to calculating the number of hours reasonably expended, the court "should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" <u>Public Int. Research Group of N.J., Inc. v. Windall</u>, 51 F.3d 1179, 1188 (3d Cir. 1995) (internal citation omitted); <u>see also</u> <u>Dellarciprete</u>, 892 F.2d at 1183 ("The district court should exclude hours that are not reasonably calculated."). In general, hours are not considered to have been reasonably expended "if they are excessive, redundant, or otherwise unnecessary."

Id. The court may permissibly deduct hours from the fee award if the attorney inadequately documents the hours claimed. Id.

Once the petitioning party has made the preliminary showing described above, "the resulting product is presumed to be the reasonable fee to which counsel is entitled." Id. The burden then shifts to the party opposing the claimed fees by making specific objections to the proposed fee by way of an affidavit or brief. Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990). Upon consideration of the opposing party's objections, the district court enjoys substantial discretion to adjust the lodestar and ultimate fee downward. Id.

In addition to the traditional lodestar analysis, we note that in the context of Rule 11 sanctions – unlike in the more familiar fee-shifting context where a party is entitled to reasonable attorneys' fees and costs as a prevailing party – the court may only impose a sanction that represents "the minimum that will serve to adequately deter the undesirable behavior" that precipitated the sanction. Doering, 857 F.2d at 194 (citation omitted). Indeed, the Third Circuit has made clear that district courts must consider these factors when determining the appropriate amount of attorney's fees to charge the lawyer found to have violated Rule 11. Id. at 195 ("We . . . direct the district courts to consider various mitigating factors in their calculation of the total monetary compensation owed by lawyers who have been found to have violated

Rule 11."). The reason for these additional considerations is that fees imposed as a sanction implicate different policies than those that support fee shifting in favor of a prevailing party. See Doering, 857 F.2d at 196 ("The policy considerations behind fee awards to prevailing plaintiffs under civil rights statutes, however, are different from the policies underlying sanctions under Rule 11").

One particularly important consideration in determining an appropriate fee charged for Rule 11 violations is the violating party's ability to pay. Id. at 195. The Third Circuit explained:

> A particularly relevant equitable factor is the sanctioned party's ability to pay. Obviously, the deterrent effect of an award of attorney's fees depends on the extent of the sanctioned party's resources. But while a monetary sanction, such as attorney's fees, is clearly an acceptable choice of deterrent, courts must be careful not to impose monetary sanctions so great that they are punitive -- or that might even drive the sanctioned party out of practice.

Id. at 195-96 (footnotes omitted). Other considerations that district courts are expected to evaluate in assessing an appropriate attorney's fee as a sanction for Rule 11 violations include: (1) the public's interest in encouraging certain types of lawsuits; (2) the sanctioned attorney's history of filing frivolous actions; (3) the defendant's need for compensation; (4) the degree of frivolousness of the action; and

(5) whether the frivolousness indicated that a less sophisticated or expensive response by the defendant was required.  Id. at 197 and n.6.

## B.    Assessment of Sanctions in This Case

### (1)    Attorney's  Fees

Applying these legal benchmarks we now turn to the assessment of costs and attorney's fees in this case.  In this regard, "[t]he starting point for a determination of attorney's fees, the lodestar calculation, is the product of the number of hours reasonably expended in responding to the frivolous paper times an hourly fee based on the prevailing market rate."  Doering v. Union County Bd. of Chosen Freeholders, 857 F.2d 191, 195 (3d Cir. 1988); see also Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). In his motion, Bartos has claimed fees and costs totaling $32,271.67. The largest component of these sanctions is attorney's fees totaling $30,350, which Bartos has calculated in the following fashion: (1) attorney's fees for 84.0 hours of legal work, as to which Bartos seeks reimbursement at a rate of $350 per hour; and (2) fees for 9.5 hours of paralegal work, as to which Bartos seeks reimbursement at a rate of $100 per hour.

Olenick and Hagerich have lodged two specific objections to this attorney's fee calculation. Olenick and Hagerich claim: (1) that the $350 per hour attorney fee rate claimed by Bartos is excessive given Bartos' counsel candid admission that he is only

billing Bartos $200 per hour for this legal work; and (2) that costs and expenses relating to the deposition of one witness, Mark Vottero, be disallowed since Vottero's deposition testimony did not relate solely to issues involving the sanctions motion. (Id.) We will address each of these issues in turn.

### (a)    Hourly Rate Calculation

At the outset, in considering the hourly rate to charge for these attorney's fees as sanctions, we conclude that the appropriate benchmark hourly rate in this case is the rate which Plaintiff's counsel actually charged his client, $200 per hour. In reaching this result, we acknowledge that Plaintiff's counsel has represented his client with great skill and vigor. Indeed, counsel's performance in this matter has been exemplary, vindicating both his client's interests, and the Court's insistence upon the adherence to the truth.

However,  our own assessment of fee award hourly rates approved by the courts in this district suggests that an attorney of Plaintiff counsel's background, and experience in this particular legal marketplace typically commands a fee rate of between $200 and $300. See, e.g., Haines v. Forbes Road School Dist., No. 07–851, 2010 WL 56101 (M.D.Pa. Jan. 5, 2010)($280 hourly rate); Diana v. Oliphant, No. 05-2338, 2009 WL 2426134 (M.D. Pa. Aug. 6, 2009)(hourly rates of $260 and $250);

Buck v. Stankovic, No. 07-717, 2008 WL 4072656 (M.D.Pa. Aug. 27, 2008)(finding a range of reasonable rates for attorneys of varying experience between $160 and $300 per hour); Lohman v. Borough, No. 05-1463, 2008 WL 2951070 (M.D. Pa. July 30, 22008)(hourly rate of $215); DIRECT TV v. Walsh, No. 03-72, 2006 WL 3308668 (M.D.Pa. Oct. 12, 2006)(hourly rates range between $175-$200). This finding is confirmed by the declaration of Plaintiff's counsel in this case, which cites fee rates of between $200 and $250 which counsel actually charges his various clients. (Doc. 89-3, ¶¶ 10 and 11.) That declaration goes on to specify the fees actually charged by counsel in this case, stating:

> Several of my clients I continue to bill the rate that was in effect at the time they engaged my services; I do this as a courtesy to the client, as my fee agreement reserves the right to bill at my then-current rate. Mr. Bartos is such a client, and has been billed from the time of his engagement to the present at the rate of $200 per hour for legal services and $100 per hour for paralegal services.

(Id., ¶ 11.)

Given this candid acknowledgment by Plaintiff's counsel of the hourly rate actually billed in this case, $200, we believe that this hourly rate is the proper benchmark to use in this sanctions matter. In reaching this result, we note that in the context of sanctions litigation we are enjoined to only impose a sanction that represents "the minimum that will serve to adequately deter the undesirable behavior"

that precipitated the sanction. <u>Doering</u>, 857 F.2d at 194 (citation omitted). Indeed, the court of appeals has made it clear that we should consider these factors when determining the appropriate amount of attorney's fees to charge as a sanction for litigation misconduct and has expressly "direct[ed] the district courts to consider various mitigating factors in their calculation of the total monetary compensation owed by [those] who have been found to have [engaged in litigation misconduct]." <u>Id.</u> at 195. Since the "policy considerations behind fee awards to prevailing plaintiffs under civil rights statutes, . . . are different from the policies underlying sanctions", <u>Id.</u> at 196, attorney's fees awarded as a sanction for misconduct should be only the "the minimum that will serve to adequately deter the undesirable behavior" that precipitated the sanction. <u>Id.</u>, at 194 (citation omitted). In this case, that minimum appropriate sanction is represented by the amount of the actual hourly fee rate billed by Plaintiff's counsel, $200 per hour.[3]

### (b) <u>Hours Worked</u>

Plaintiff's counsel then details 84.0 of legal work which he directly attributes to the deceitful conduct of Hagerich and Olenick.(Doc. 89-3.) For the most part, these

---

[3]No objection has been lodged to the paralegal hourly rate of $100 per hour, and we will accept that rate without objection.

costs are thoroughly documented, are clearly related to the litigation of this sanction matter, and are wholly uncontested by the witnesses.

Indeed, the only area of disagreement relates to attorney's fees for the January 2010 deposition of one witness, Mark Vottero, a fees item which Olenick and Hagerich dispute, claiming that this deposition was not solely related to the sanctions litigation. (Docs. 97 and 98.) The total amount of the hours that appear to be directly related to the Vottero deposition is limited, 6 hours of attorney time. (Doc. 89-3, Ex. A.)

Thus, as to these fees, the parties' positions represent two extreme polar opposites: Bartos seeks reimbursement for all of the expenses associated with this particular deposition. Olenick and Hagerich, in turn, assert that none of these deposition fees and expenses should be assessed against them, We find that the proper course is a middle path between these two extreme views. With respect to this particular deposition, the undisputed facts are that at the outset of this litigation, in June 2008, all of the parties identified Mark Vottero, a state DEP employee, in their joint case management plan as a potential witness in this matter (Doc. 12.) Thus, from the outset of this litigation, all of the parties recognized Vottero as a potential deponent.

Vottero's deposition, however, assumed a different and more specific urgency late in 2009, as the false deposition testimony of Olenick and Hagerich came to light. That false testimony related to the circumstances surrounding the creation and dissemination of an anonymous letter accusing Bartos of workplace misconduct. When Hagerich and Olenick were deposed late in 2009 regarding their admitted involvement in this litigation misconduct, both witnesses identified Vottero as a person who also had first-hand knowledge of these events.

In light of this belated disclosure by Olenick and Hagerich, the deposition of Mark Vottero assumed greater significance, and now had a dual significance. Vottero's deposition addressed both long-standing issues identified by the parties at the outset of this litigation, and also had particular relevance to the sanctions issue, since Vottero had been involved in the events which gave rise to this sanction litigation.

In this setting, where Vottero was long recognized as a potential deponent but became a deponent of greater significance to the parties as this sanctions matter unfolded, we believe that Olenick and Hagerich should be required to bear part of the expense of this deposition, a deposition which became necessary, in part, because of their lies and misconduct. Specifically, we find that Olenick and Hagerich should bear half the cost of this particular deposition, a division of costs and fees which fairly

reflects the fact that, while Vottero was identified as a potential deponent at the outset of the case, the misconduct of Olenick and Hagerich compounded the need for this deposition.

Adopting this approach, we find that 3 of the 6 hours of attorney time spent on the Vottero deposition should be assessed against Olenick and Hagerich as sanctions. Having made this finding, we adjust the total number of hours for attorney fee calculation purposes from 84.0 hours to 81.0 hours.[4]

### (c)    Attorney Fees Sanctions Calculation

On the basis of these findings we conclude that the proper measure of attorney's fees to assess in this case is $17,150. This fees award consists of attorney fees of $16,200 based upon the actual hourly rate charged here, $200, multiplied by 81.0 hours of legal work attributed to this sanctions matter, plus an additional 9.5 hours of paralegal work attributed to this sanctions litigation, billed at an hourly rate of $100 per hour.

---

[4]No objection has been lodged to the paralegal hours of 9.5 hours claimed here, and we will accept that calculation of hours worked without objection.

### (2)    Costs

Having determined the amount of this attorney fees award, we now examine

the Plaintiff's claims for costs as sanctions in this case. With respect to these costs,

the costs claimed by the Plaintiff fall into the following categories:

| CLAIMED COSTS | AMOUNT CLAIMED |
|---|---|
| Attorney Costs | $55.64 |
| Bartos Expenses Attending Olenick, Hagerich and Vottero depositions | |
| -Parking fees | $45.00 |
| -Mileage | $201.96 |
| -Wages | $461.52 |
| Stenographic Expenses | $1,157.55 |
| TOTAL CLAIMED COSTS | $1,886.03 |

(Doc. 89-2, Bartos declaration.)

Many of these costs are directly related  to the depositions of Olenick and

Hagerich, and are undisputed by these witnesses. Indeed, of the combined costs

identified by Bartos, at least $1,068.07 are directly attributable to the depositions of

Hagerich and Olenick. All of these costs are proper sanctions and all of these costs

will be imposed by the Court.

Instead, the only costs which these witnesses dispute are those related to the deposition of Mark Vottero. As we have previously noted, in this case we have found that, while Vottero was identified as a potential deponent at the outset of the case the misconduct of Olenick and Hagerich compounded the need for this deposition, a fact which calls for these witnesses to bear half of the costs of the Vottero deposition.

Bartos' costs which can be specifically attributed to the Vottero deposition are as follows: transcript fees of $561.80; parking fees of $15; mileage reimbursement of $67.32; and one day's lost wages totaling $153.84. Thus, the total, combined costs for the deposition of Mark Vottero are $797.96. Half of these costs, the proportion we have found that should be assessed against Olenick and Hagerich as sanctions, amounts to $398.98. When this sum is added to the undisputed costs of $1,067.07, the total costs which are properly assessed here as sanctions is $1,466.05.

### (C)  Allocation of Sanctions Fees and Costs

Having determined as a matter of arithmetic that the proper sanction here in terms of attorney fees and costs, is attorney fees of $17,150, and costs of $1,466,05, for a total of approximately $18,616.05, we conclude that the appropriate way in which to allocate these sanctions is to require each witness to bear in equal measures half of these fees and costs as sanctions. Dividing these costs in half fairly allocates these sanctions in this case where the culpability of Olenick and Hagerich is quite

comparable. Furthermore, dividing these costs and fees in half, and imposing responsibility on each witness to pay half of this total sum, recognizes the economic hardships which the witnesses now face, a factor which Olenick and Hagerich have both cited to the court, (Docs. 97 and 98), and a consideration which we are mandated by law to consider. Indeed, as the court of appeals has aptly observed: "A particularly relevant equitable factor is the sanctioned party's ability to pay. Obviously, the deterrent effect of an award of attorney's fees depends on the extent of the sanctioned party's resources. But while a monetary sanction, such as attorney's fees, is clearly an acceptable choice of deterrent, courts must be careful not to impose monetary sanctions so great that they are punitive ...." Doering, 857 F.2d at 195-96.

Requiring each witness to bear responsibility for half of these costs and fees pays full fidelity to these basic equitable principles which govern our discretion in this field while imposing an individual monetary penalty of $9,308.03[5] on Olenick and Hagerich, a penalty that graphically underscores the value which the Court places on the truth, and the costs of calculated deceit.[6]

---

[5]We recognize that a precise mathematical division of these costs yields shares of $9,308.025 for each witness. In the exercise of our discretion we have elected to round this sum up to $9,308.03 each, for a combined total of $18,616.06.

[6]In setting the amount of these individual sanctions, we also recognize that Olenick and Hagerich had some legal fees reimbursed by the Commonwealth, a

## III. Conclusion

Accordingly, for the foregoing reasons, upon consideration of this Petition for Attorneys' Fees and Costs (Docs. 89, 90, 99 and 100), and the responses thereto (Docs. 97 and 98), IT IS ORDERED that the Petition be GRANTED, in part, and attorneys' fees of $17,150.01 are awarded in this matter, along with costs totaling, $1,466.05, for a total sanction of fees and costs of $18,616.06. IT IS FURTHER ORDERED that Patricia Olenick and Donald Hagerich shall each make payments of half of these fees and costs, in individual amounts of $9,308.03 each to the Plaintiff's counsel on or before **August 23, 2010.**[7]

_____

point which the Plaintiff advances as a reason not to mitigate these sanctions. While we appreciate the Plaintiff's argument, we also recognize that various factors under state law may have dictated this course of action for the Commonwealth, and we find that the partial payment of these fees, which may have been compelled by state law and practices, is not a mitigating factor of the type which justifies imposition of a more severe sanction here. We also find that, in assessing the proper measure of sanctions at this time, we should look to the current financial situation of Olenick and Hagerich. In this regard, we find that both Olenick and Hagerich have experienced, and will continue to experience, other collateral financial costs in terms of their employment as a result of their decision to engage in this deceit. Taking these costs, and the financial circumstances of these witnesses into account, we find that the penalty we impose, more than $9,300 each, is an appropriate sanction.

[7] Pursuant to 28 U.S.C. § 636(b)(1)(A), this Court, as a United States Magistrate Judge, is authorized to rule upon attorney fee and sanctions disputes like those presented in this case. See, e.g., Merritt v. Int'l. Brotherhood of Boilermakers, 649 F.2d 1013 (5th Cir. 1981); Temple v. WISAP USA in Texas, 152 F.R.D. 591 (D.Neb. 1993). However, we note for the parties that under 28

So ordered this 20th day of July, 2010.

_S/Martin C. Carlson_
**United States Magistrate Judge**

---

U.S.C. § 636(b)(1)(A) the parties may seek review of this order by filing a motion to reconsider with the district court since: "A judge of the [district] court may reconsider any . . . matter [decided under the under this subparagraph] where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).