## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEPHEN D. BARTOS,** | : | **Civil  No. 1:08-CV-0366** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | **(Chief Judge Kane)** |
| **PENNSYLVANIA, DEPARTMENT** | : | |
| **OF ENVIRONMENTAL** | : | |
| **PROTECTION; KATHLEEN A.** | : | **(Magistrate Judge Carlson)** |
| **MCGINTY, in her individual** | : | |
| **and official capacity; PATRICK** | : | |
| **MCDONNELL, in his individual** | : | |
| **and official capacity; And KENNETH** | : | |
| **R. REISINGER, in his individual** | : | |
| **and official capacity,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This civil rights case, which comes before the Court on a motion for summary
judgment, presents an array of questions concerning the nature of a public employee's
property right to a government job, the limitations which the First Amendment may
place of state officials when discharging and disciplining employees, and the
protections afforded public employees by state and federal statutes. These questions
are presented to the Court cast against the backdrop of the discharge of  the Plaintiff,

a DEP supervisor and alleged whistle-blower, who was also accused of serious work-place misconduct, and are cast in stark relief against a toxic work place environment marked by mutual recriminations, allegations, and various asserted acts of retaliation and deceit. While a number of Bartos' claims fail as a matter of law, these competing assertions of misconduct, mismanagement, retaliation, deception and malfeasance, leveled by the parties against one another, in some instances define factual disputes which must be tried. Thus, while many of Bartos' claims fail as a matter of law, for the reasons set forth below, it is recommended that the Court find, on these facts, that the Defendants' motion for summary judgment should be granted, in part, and denied, in part.

## II.   Statement of Facts and of the Case.

### A.   Stephen Bartos

Stephen Bartos is a former employee of the Commonwealth of Pennsylvania, Department of Environment Protection (DEP), having worked for that agency, and it predecessor agency the Department of Environmental Resources, from 1987 through 1990, and again from 1997 through 2007. (Doc. 118-2, ¶¶ 1-2.) Between 2001 and 2006, Bartos enjoyed a series of promotions at DEP, (Doc. 110, ¶¶4-7), and by August 2006 held the title of Environmental Group Manager. (Id., ¶ 8), a position that was excluded from collective bargaining at this agency. In 2006 and 2007,

Bartos' immediate supervisor was Stephen Socash, who was supervised, in turn, by the Bureau Director of Waste Management, Defendant Kenneth Reisinger. (Id., ¶9.)

As Environmental Group Manager, Bartos' duties included development, oversight and general management of the Cleanup Our Anthracite Lands and Streams ("COALS") program; management of compliance and enforcement actions within the fourteen county regional area of the North-central DEP Office for the Waste Management Program; acting as a senior advisor to field staff on methods of investigation and inspection techniques for obtaining evidence to develop cases for legal proceedings; and supervising a small staff three employees - Todd Miller, Patti Olenick and Don Hagerich. (Id., ¶¶ 11-13.)

Beginning in the summer of 2006, Bartos also began serving as a liaison between DEP's Cleanup Our Anthracite Lands and Streams ("COALS") program and a non-profit organization, Keep Pennsylvania Beautiful. ("KPB") KPB was a DEP-supported, non-profit group, which developed, promoted and encouraged anti-litter activities, programs and initiatives throughout Pennsylvania. (Id., ¶¶ 16-17.) By November 2006, Bartos was designated as the proxy for Secretary McGinty at KPB board meetings. (Id., ¶ 22.)

## B.     Bartos Becomes Embroiled in Dual Controversies at DEP

In 2007 Bartos became embroiled in two concurrent controversies at DEP, dual controversies that mark and define the disputes in this lawsuit.

One of these controversies related to the KPB program and its funding. At the time of the events in this lawsuit, the Municipal Waste Planning, Recycling and Waste Reduction Act, Act of July 28, 1988, 53 P.S. § 4000.101 et seq., mandated recycling in certain Pennsylvania municipalities, required counties to develop municipal waste management plans, and provided grants to offset some local government recycling expenses. Section 902 of the Act, in turn, provided for grants to municipalities ("902 Grants") for development of municipal recycling programs. 902 Grants were available only to Pennsylvania municipalities, a county, city, borough, incorporated town, township, or home rule municipality, were awarded through competitive grant process and, once approved, were issued through grant contracts with DEP. (Doc. 118-2, ¶¶ 13-19.)

After Bartos was assigned to serve as DEP's proxy to the KPB board, he conducted a review to identify funding availability and needs for KPB. (Doc. 118-2, ¶¶ 28-29.) The circumstances surrounding this review were mired in controversy from the outset, with Reisinger asserting that he directed this review, (Doc. 110, ¶ 24), and Bartos insisting that he acted on his own initiative without Reisinger's direction or

approval. (Doc. 118-2, ¶ 29.) In any event, during this review, Bartos learned that KPB received funds, in part, from Section 902 Grants, by way of "pass-thru" funding, in which KPB was earmarked on the relevant grantee's 902 Grant as a recipient of funds, ostensibly for goods or services that KPB would deliver to the grantee. (Id., ¶¶ 30-31.)

In January and February of 2007, Bartos communicated these findings, and concerns which he had regarding this grant process, to Reisinger. (Doc. 110, ¶¶ 24-32; Doc. 118-2, ¶¶ 39-48.) Bartos' findings, which were highly critical of this process, allegedly conflicted with the views of another supervisor at DEP, Lawrence Holley. At the time of these events Holley, an African-American, was Chief of the Division of Waste Minimization and Recycling within the Bureau of Waste Management. Holley was responsible for the recycling programs in the Commonwealth and was involved with the anti-litter efforts of KPB. Bartos alleges that during this time, Bartos began supplanting Holley within DEP, and had professional conflicts with Holley. (Id.) Ultimately, Bartos' findings regarding this funding process were embodied in a 360 page report which was forwarded to Secretary McGinty, who then suspended this funding process. (Doc. 110, ¶¶ 34-39.)

While there is general agreement on these facts, Bartos and Reisinger provide starkly different views and perceptions regarding their respective roles in this process.

5

For his part, Reisinger asserts that he initiated this review, supported its goals, and endorsed the suspension of this funding process. (Doc. 110, ¶¶ 24-39.) Bartos, in contrast, alleges that Reisinger resisted this review, interfered with the review, and excluded Bartos from critical meetings and discussions relating to this review. (Doc. 118-2, ¶¶ 39-68.) From this fundamental factual dispute, a further controversy arose between these two men in the summer and fall of 2007, a controversy that is now also the subject of wildly differing interpretations by the parties.

This second, concurrent controversy arose in the summer of 2007. By June of 2007 Bartos learned that he was being considered for promotion in DEP to a position overseen by Reisinger and held by one of Bartos' bureaucratic adversaries on the section 902 pass-through dispute, Lawrence Holley. (Doc. 118-2, ¶¶ 69-72.) From his workplace contacts with Reisinger, Bartos understood that Reisinger disfavored his promotion to this job. (Id.) At the same time, Reisinger alleges that Holley approached him and reported that three DEP staff members had informed Holley that Bartos was using racial slurs towards Holley. (Doc. 110, ¶ 40.) The confluence of these two events set in motion a course of conduct by both men marked by competing claims of principle and prejudice.

For his part, Reisinger asserts that he conducted a personnel investigation, in conjunction with DEP's human resources staff, which corroborated these allegations

of racist remarks by Bartos. (Doc. 110, ¶¶ 43-53.)[1] Having resolved that discipline was appropriate, Reisinger and DEP human resources staff scheduled a pre-disciplinary conference with Bartos on July 23, 2007. Bartos was notified of this conference on July 20, 2007, and was advised that he was entitled to assistance of counsel at this workplace discipline conference, but was not provided further details concerning the purpose of the conference. (Doc. 110, ¶¶ 54-55; Doc. 118-2, ¶¶ 78-80.)

This conference was conducted on July 23, 2007. Bartos attended, represented by counsel. (Doc. 110, ¶¶ 56-64; Doc. 118-2, ¶¶ 80-82.) Reisinger conducted the conference, along with DEP human resources staff, questioning Bartos regarding the allegations, and providing Bartos with the opportunity to respond to these charges. (Id.) In response, Bartos denied each and every one of the allegations leveled against him. (Id.)

Each man asserts that he came away from the conference with a very different perception of the meeting. From his perspective Bartos claims that, after the conference he: "recognized that [he] had been set up by persons in the Bureau both

---

[1]This investigation entailed, in part, an interview with Donald Hagerich, who allegedly confirmed these racially charged remarks by Bartos. (Doc. 110, ¶¶ 47-48.) Bartos attacks the reliability and credibility of these statements by Hagerich noting among other things that Hagerich has admitted to repeatedly lying under oath during depositions in this case.

above and below me in the chain of command, up to and including Reisinger." (Doc. 118-2, ¶ 83.) Bartos linked these events to his opposition to the pass-through payments that he had uncovered. Accordingly, on August 5, 2007, Bartos "advised McGinty by email of [his] concern that she was not provided many of the findings or details related to the KPB Audit, including findings that 902 Grant 'funds may have been mismanaged, while at worst there may have been misappropriation of funds.'" (Id., ¶ 84.) McGinty, in turn, handled this communication from Bartos in a scrupulously correct fashion, referring it to legal counsel who, in turn, referred it for investigation. (Doc. 110, ¶¶ 74-82.)

While Bartos was voicing this concern that he was being unfairly singled out because of his whistle-blower status, Reisinger asserts that he had independently resolved that Bartos' denial of racially charged behavior with his DEP staff was not credible. Accordingly, Reisinger recommended that Bartos be disciplined, a recommendation that was adopted and implemented on August 30, 2007, when Bartos was suspended by Reisinger for three days effective September 11, 2007, because Reisinger found that Bartos had engaged in inappropriate workplace behavior, used racial slurs and made inappropriate racially provocative remarks in front of staff members. (Doc. 110, ¶ 66.) Thus, by August, 2007 Bartos and Reisinger were each

ascribing prejudices to one another, while asserting that they were each taking principled stands in response to the prejudicial conduct of the other.

The suspension letter that Reisinger delivered to Bartos, on its face, provided Bartos with an explanation of the disciplinary charges, discipline process, findings, and appeal procedures. (Doc. 110, ¶¶ 66-70.) However, according to Bartos, the manner in which this facially neutral letter was delivered by Reisinger suggested that this action was punitive and retaliatory on Reisinger's part, since Bartos claims that Reisinger tied this disciplinary proceeding to Bartos' objections to the Section 902 pass through payments, telling Bartos that he "needed to do nothing" on the audit of these funds, and suggesting to Bartos that "We don't need to tell anyone" about this job discipline. (Doc. 118-2, ¶ 87.) Bartos also insisted that when "Reisinger handed the suspension letter to [him], he made clear . . that he wanted [Bartos] to accept the discipline and keep silent as to [his] concerns regarding KPB funding and the KPB Audit," (id., ¶ 90), factual assertions that Reisinger disputes.

Despite what he claims were these warnings, Bartos sought to challenge this discipline, filing an appeal with the State Civil Service Commission on September 14, 2007. (Doc. 110, ¶ 70-71, Doc. 118-2, ¶ 89.) In this appeal, Bartos alleged that Reisinger's actions were taken in retaliation for Bartos' whistle-blower status with respect to the Section 902 pass-through funding. (Id.)

In the wake of this appeal and allegation by Bartos, Reisinger instituted two additional disciplinary actions against Bartos in the span of 90 days, conducting disciplinary conferences on October 18, 2007, and December 4, 2007, conferences which culminated with Bartos' termination from DEP.  While this swift chronology of progressive discipline and discharge following Bartos' claim that he was being retaliated against due to his whistle-blower status, is undisputed, the parties' competing factual views of what transpired remain irreconcilable. For his part, Bartos described this 90-day career spiral as a series of pretextual events instigated by Reisinger based upon false charges made by employees who are admitted liars. In contrast, Reisinger describes his actions as measured, appropriate responses to increasingly improper conduct by Bartos in the workplace, conduct that included harassment, threats, obstruction of justice, and the use of racial epithets by Bartos.

While these questions of motivation remain subject to wildly competing interpretations, several facts are undisputed. First, there is no real dispute regarding the procedural protections afforded to Bartos during this process. In each instance, Bartos received notice of these disciplinary proceedings. In each instance, he was presented with the charges against him, and was given the opportunity to address those specific charges. In each instance, Bartos was represented by counsel, and in

each instance Bartos was provided with notice of his appellate rights in this workplace discipline setting.

In addition, the undisputed evidence shows that Reisinger was the principal protagonist in these disciplinary proceedings. Thus, after the December 2007 disciplinary proceeding, Reisinger advocated that Bartos be fired. Thus, while Patrick McDonnell, DEP's director of administration, signed this termination letter, he did so only on Reisinger's recommendation and after consulting with agency counsel. (Doc. 110, ¶¶ 133-135.) Secretary McGinty, in turn, was informed of this decision, and concurred in it based upon the information provided to her. (Id., ¶¶ 136-138.) However, neither McDonnell, nor McGinty played an active role in the underlying events or investigations which led to this employment action. Indeed, Bartos has subsequently admitted that he never had any conversations with McDonnell about anything having to do with this case and is unaware of what role, if any, McGinty or McDonnell played in theses disciplinary proceedings. (Doc. 110, ¶¶ 147-148.)

### C.   <u>Procedural History</u>

On February 26, 2008, Bartos filed this action in federal court. (Doc. 1.) In his complaint, Bartos named the Commonwealth of Pennsylvania Department of Environmental Protection, the Secretary of the Department, Kathleen McGinty,

Patrick McDonnell, the Deputy Secretary for Administration, and Kenneth Reisinger, Bartos' former DEP supervisor, as Defendants. (Id.) Bartos then alleged six causes of action against these Defendants. (Id.) First, Bartos brought a claim under the civil rights statute, 42 U.S.C. § 1983, alleging that Reisinger, McDonnell and McGinty denied him his procedural due process rights in the course of the disciplinary proceedings that led to his discharge. (Id., ¶¶ 123-125.) Second, Bartos brought a § 1983 claim against Reisinger, McDonnell and McGinty, alleging that their actions deprived him of constitutionally protected liberty interests in violation of the due process clause of the United States Constitution. (Id., ¶¶ 126-128.) Bartos then brought a third § 1983 civil rights claim against Reisinger, McDonnell and McGinty, alleging that this disciplinary actions represented a form of constitutionally prohibited retaliation against him for engaging in petitioning activity protected by the First Amendment. (Id., ¶¶ 129-132.) Bartos next asserted that Reisinger, McDonnell and McGinty conspired to violate his civil rights, in violation of 42 U.S.C. § 1985(3). (Id., ¶¶ 133-139.) In his fifth cause of action, Bartos alleged that the disciplinary actions taken by Reisinger, with the approval of McDonnell and McGinty, violated the Fair Labor Standards Act, 29 U.S.C. § 201.(Id., ¶¶ 140-147.) Finally, Bartos lodged a pendent state claim for damages under Pennsylvania's whistle-blower statute, 43

12

Pa.C.S. §1423, et seq., against both the Department of Environmental Protection, as an agency, and the individual agency official Defendants. (Id., ¶¶ 148-153.)

Following discovery,[2] the Defendants moved for summary judgment on all of Bartos' claims. This motion has been fully, and exhaustively, briefed by all parties, and is now ripe for resolution.

For the reasons set forth below, we find that some claims and parties are entitled to be dismissed from this lawsuit, However, as to the core competing claims made in this case regarding whether Bartos' discharge was a result of his discrimination against others, or was the product of others' discrimination against him, we conclude that disputed factual issues preclude summary judgment at this time.

## II.   **Discussion**

### A.   **Rule 56–The Legal Standard.**

The Defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought

---

[2] This discovery was marked by an unusual development, sanctions proceedings that were instituted after two state employee witnesses, Donald Hagerich and Patricia Olenick, later admitted to lying under oath in depositions in this litigation about their own later efforts to retaliate against Bartos through an anonymous letter writing campaign.

13

should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest

solely on assertions made in the pleadings, legal memoranda, or oral argument."

Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment

is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if

the non-moving party provides merely colorable, conclusory, or speculative evidence.

Anderson, 477 U.S. at 249.   There must be more than a scintilla of evidence

supporting the nonmoving party and more than some metaphysical doubt as to the

material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider

all evidence in the light most favorable to the party opposing the motion."  A.W. v.

Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing

to disputed material issues of fact must show by competent evidence that such factual

disputes exist. Thus, "only evidence which is admissible at trial may be considered

in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers

Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force

to parties who attempt to rely upon hearsay statements to establish material issues of

fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n. 2 (3d Cir. 2000), citing, Stelwagon Mfg. V. Tarmac Roofing, Suys., Inc., 63 F.3d 1267, 1275, n. 17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon University, No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon University,

16

No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); <u>Carpet Group International v. Oriental Rug Importers Association, Inc.</u>, 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. Of Newark NJ v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982), <u>see</u> <u>Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

17

### B.      Defendants McDonnell and McGinty Should be Dismissed from this Lawsuit

At the outset, we consider the Plaintiff's claims against the individual supervisory Defendants named in this complaint, Defendants McGinty and McDonnell. McDonnell and McGinty have both moved for summary judgment, insisting that they are entitled to qualified immunity on all of Bartos' claims.

Bartos brings this civil rights actions against McDonnell and McGinty seeking to hold them personally liable for damages as a result of alleged violation of his rights resulting from his discharge.  In order to establish such a claim a plaintiff must show the deprivation of a right secured by the United States Constitution. Satisfying these elements alone, however, does not guarantee that Bartos is entitled to recover damages from this public official.  Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct. 808, 815 (2009).  This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted).  Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 129 S. Ct. at 815 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 129 S. Ct. 808; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances

would understand that his conduct violates that right.  <u>Williams</u>, 455 F.3d at 191

(citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated

must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615.  The

Supreme Court has explained that, at least in some cases, "a general constitutional

rule already identified in the decisional law may apply with obvious clarity to the

specific conduct in question, even though the very action in question has [not]

previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting

<u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and

citation omitted)).  In some cases, "officials can still be on notice that their conduct

violates established law even in novel factual circumstances." <u>Wilson</u>, 455 F.3d at

191 (quoting <u>Hope</u>, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially,

<u>Pearson</u>, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award

qualified immunity to a defendant if it is apparent that the defendant did not violate

rights that were clearly established at the time the defendant acted. <u>Id.</u> Where a court

elects to address the alleged constitutional violations, however, the court's analysis

of the merits for purposes of summary judgment merges with analysis of the

deprivation of federal rights for purposes of qualified immunity.  <u>Gruenke v. Seip</u>,

20

225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

At the outset, in assessing whether Bartos' complaint sets forth a viable cause of action against McDonnell and McGinty which can survive summary judgment, we begin with the familiar proposition that "[t]he federal civil rights statute here at issue, 42 U.S.C. § 1983, 'is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred.' Baker v. McCollan, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). [Therefore] [t]o establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury. Sameric Corp. of Del., Inc. v. City of Phila., 142 F.3d 582, 590 (3d Cir.1998)." Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005).

21

These principles have particular resonance for government agency supervisors like McDonnell and McGinty. It is clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named Defendant was an agency supervisor when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v. Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to agency supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. .

> . . <u>See</u> <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658,
> 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability
> for a municipal "person" under 42 U.S.C. § 1983); see also <u>Dunlop v.</u>
> <u>Munroe</u>, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's
> liability "will only result from his own neglect in not properly
> superintending the discharge" of his subordinates' duties); <u>Robertson v.</u>
> <u>Sichel</u>, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A
> public officer or agent is not responsible for the misfeasances or position
> wrongs, or for the nonfeasances, or negligences, or omissions of duty,
> of the subagents or servants or other persons properly employed by or
> under him, in the discharge of his official duties"). Because vicarious
> liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead
> that each Government-official defendant, through the official's own
> individual actions, has violated the Constitution.

<u>Ashcroft v. Iqbal</u>,  129 S.Ct. 1937, 1948 (2009).  Applying these benchmarks, courts

have frequently held that, in the absence of  evidence of supervisory knowledge and

approval of subordinates' wrongful  actions, a plaintiff may not maintain an action

against supervisors based upon the misdeeds of their subordinates. <u>O'Connell v.</u>

<u>Sobina</u>, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); <u>Neuburger v.</u>

<u>Thompson</u>, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004).

Judged in light of these standards, Bartos' claims against McDonnell and

McGinty fail. Bartos has not presented competent proof which shows that either of

these Defendants had personal involvement in any alleged misconduct, demonstrated

either through personal direction or actual knowledge and acquiescence in this

misconduct.   Quite the contrary, as to McGinty, the evidence shows that she

supported Bartos' recommendation that the section 902 pass-through program be curtailed, and referred his other allegations to legal counsel and investigators for appropriate response. These actions are the principal factual averments leveled against McGinty. Yet, these actions are entirely appropriate, and completely inconsistent with a claim that McGinty knowingly participated in discrimination against Bartos.

While McGinty and McDonnell also concurred in Reisinger's recommendation that Bartos be fired, there is no competent proof that they took this action sharing the illicit motives that Bartos ascribes to Reisinger. Instead, these Defendants concurred in Reisinger's decision and recommendation only after consulting with counsel. Bartos has not effectively disputed McDonnell's and McGinty's claim that they acted in reliance on advice of counsel when they concurred in this workplace discipline, and, therefore, are "presumptively entitled to qualified immunity." Kelly v. Borough of Carlisle, 622 F.3d 248, 256 (3d Cir. 2010). As to McDonnell and McGinty, this presumption has not been rebutted by Bartos through competent proof that these Defendants were motivated by some sort of unconstitutional animus, Monteiro v. City of Elizabeth, 436 F.3d. 397, 405 (3d Cir. 2006), and in the absence of such proof

these Defendants[3] are entitled to qualified immunity. In short, given the state of the law in this field, these supervisory Defendants– who did not play an active role in the conduct which Bartos asserts violated his rights, and only acted with the advice of counsel– simply could not have recognized that their actions would violate "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Therefore, these Defendants are entitled to qualified immunity on this claim

## C.   The Plaintiff Fails to Articulate A Valid Procedural Due Process Claim

Having disposed of Bartos' claim against the individual supervisory Defendants, we now turn to a consideration of the merits of the various constitutional and statutory claims leveled against the remaining individual and institutional Defendants in this case. In conducting this review, we begin with the familiar proposition that 42 U.S.C. § 1983, "is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 443 U.S. 137, 145 n. 3(1979). Therefore, liability under 42 U.S.C. § 1983, exists only when a plaintiff shows that the defendants, acting under color of law,

---

[3]We recognize that Defendant Reisinger also seeks qualified immunity. We will separately address Reisinger's qualified immunity claim–which arises in a strikingly different factual framework–separately below.

violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury. <u>Elmore v. Cleary</u>, 399 F.3d 279, 281 (3d Cir. 2005).

In this case, Bartos first alleges that the manner in which Defendant Reisinger conducted these disciplinary proceedings deprived him of his procedural due process rights. Bartos faces an exacting burden of proof in advancing this procedural due process claim. In a public employment context, the contours of the Fourteenth Amendment's due process protections are clearly defined. In this setting, it is well-established that:

> The Fourteenth Amendment to the United States Constitution prohibits deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The first step in analyzing a due process claim is to determine whether the "asserted individual interest ... [is] encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property." <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir.2000) (internal citations and quotations omitted).

<u>Elmore v. Cleary</u>, 399 F.3d at 282.

With respect to such public employee procedural due process claims:

> [T]to establish a procedural due process claim, a plaintiff must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." <u>Biliski v. Red Clay Consol. School Dist. Bd. of Educ.</u>, 574 F.3d 214, 219 (3d Cir.2009) (quoting <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 234 (3d Cir.2006)). "The question of whether an employee has a property right in continued employment is a question of state [or territorial] law." <u>McDaniels v. Flick</u>, 59 F.3d 446,

458 (3d Cir.1995) (citing <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

<u>Iles v. de Jongh</u>, 638 F.3d 169, 173 (3d Cir. 2011).

Thus, to assert a procedural due process claim based upon the loss of a government job, it is evident that:

> To have a property interest in a job, . . ., a person must have more than a unilateral expectation of continued employment; rather, []he must have a legitimate entitlement to such continued employment. . . . The decisional law is clear that an at-will employee does not have a legitimate entitlement to continued employment because she serves solely at the pleasure of her employer. Therefore, once a court determines that a public employee "held [her] position at the will and pleasure of the [governmental entity]," such a finding "necessarily establishes that [the employee] had no property interest" in the job sufficient to trigger due process concerns.

<u>Elmore v. Cleary</u>, 399 F.3d at 282 (citations omitted).  <u>See</u>, <u>Wilson v. MVM, Inc</u>.,475 F.3d 166, 177 (3d Cir. 2007). In assessing whether a particular government job qualifies as "property" subject to procedural due process protection, "[a]s an initial matter, state law determines whether such a property interest exists. <u>Brown v. Trench</u>, 787 F.2d 167, 170 (3d Cir.1986); <u>see also Kelly v. Borough of Sayreville</u>, 107 F.3d 1073, 1077 (3d Cir.1997) ('State law creates the property rights protected by the Fourteenth Amendment.')." <u>Elmore v. Cleary,</u> 399 F.3d at 282.

In this case neither party argues that Bartos lacked a property interest in his continued public employment. While this issue might be subject to debate,[4] assuming that Bartos had a property interest in his public employment, we conclude that Bartos' procedural due process claim founders on other grounds since Bartos has not shown that the procedures afforded to him failed to comport with due process.

---

[4]Pennsylvania law sets demanding standards in this field. Pennsylvania is an "at-will" employment state. Thus, "under controlling Pennsylvania law, a 'public employee takes his job subject to the possibility of summary removal by the employing authority. He is essentially an employee-at-will' Scott v. Phila. Parking Auth., 402 Pa. 151, 166 A.2d 278, 280 (1960); see also Rank v. Twp. of Annville, 163 Pa.Cmwlth. 492, 641 A.2d 667, 670 (1994); Bolduc v. Bd. of Supervisors, 152 Pa.Cmwlth. 248, 618 A.2d 1188, 1190 (1992). Stated otherwise, a public employee in Pennsylvania generally serves at the pleasure of [his or] her employer and thus has no legitimate entitlement to continued employment." Elmore v. Cleary 399 F.3d at 282.   This general rule of "at-will" public employment admits of only three, narrowly-tailored exceptions: "First, the General Assembly may create a protected property interest through legislative action or authorization. Second, a protected property interest may emerge from a contract that grants the plaintiff protected status, such as employment tenure or welfare benefits. Finally, an employment contract permitting dismissal only for cause will create a property interest." D'Altilio v. Dover Tp. 2007 WL 2845073 at * 6 (citations omitted). Applying these standards, courts have repeatedly held that discharged local government employees in Pennsylvania typically do not have a property interest in their jobs sufficient to sustain a procedural due process claim. See, e.,g., Grabiak v. Pennsylvania State Police, 276 F.App'x 210 (2d Cir. 2008) Elmore v. Cleary, supra; Dobson v. Northumberland County, 151 F.App'x 166 (3d Cir. 2005); Gikas v. Wash. Sch. Dist., 328 F.3d 731, 736 (3d Cir.2003);   D'Altilio v. Dover Tp., supra,;   Holocheck v. Luzerne County Head Start, Inc., 385 F.Supp.2d 491 (M.D. Pa. 2005).

In this setting, "[d]ue process requires that a deprivation of a property interest 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542(1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313(1950)); see also Witkowski v. Welch, 173 F.3d 192, 205 (3d Cir.1999) (holding that the procedures required by due process are defined by federal law). In the employment context, notice and an opportunity to be heard generally refer to having "some kind of a hearing" before being discharged. Loudermill, 470 U.S. at 542; see also Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir.2000)." Gikas v. Washington School Dist., 328 F.3d 731, 738 (3d Cir. 2003).

Thus:

> There is no rote formula for sufficient protections under the Due Process Clause. Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). At a minimum, due process requires notice and a hearing. Reichley v. Pa. Dept. of Agriculture, 427 F.3d 236, 247 (3d Cir.2005). However, when that notice and hearing must be provided and how intensive the hearing must be is a determination that depends on the balancing of three interests: (1) the private interest at stake, (2) the risk of error in the procedure used compared with the degree of improved accuracy that additional procedures would provide, and (3) the government's interest. Mathews, 424 U.S. at 334-35, 96 S.Ct. 893

Wilson v. MVM, Inc., 475 F.3d 166, 178 (3d Cir. 2007).

Therefore, in this context, "the Supreme Court [has] held that a 'pretermination "hearing"... need not be elaborate,' but '[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.' 'The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.' Moreover, '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.' 'In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action." Biliski v. Red Clay Consol. School Dist. Bd. of Educ., 574 F.3d 214, 220-221 (3d Cir. 2009). Rather, "[i]n order to comport with due process, in cases where it is possible to conduct a pre-termination hearing, '[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.' " Iles v. de Jongh, 638 F.3d 169, 173 n.2 (3d Cir. 2011).

Here, the procedural protections provided to Bartos fully satisfied these constitutional standards. In each instance, Bartos was given advance notice of the hearing. He was notified of the charges made against him. He was allowed the assistance of counsel. He was given an opportunity to respond to those charges, and

present evidence on his own behalf. When adverse decisions were made against him, Bartos was provided with written notice of those decisions, and was specifically informed of his appeal rights. Bartos then actively exercised those rights, and sought further review of these workplace discipline decisions. While Bartos criticizes aspects to these proceedings, demanding further context and explanation of the charges leveled against him, the evidence shows that the information provided to Bartos was sufficient to allow him to understand, address and attempt to rebut each of these allegations. Since procedural due process simply requires that the public employee receives " oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story," Iles v. de Jongh, 638 F.3d 169, 173 n.2 (3d Cir. 2011), the requirements of due process were fully met here, and Bartos' procedural due process claim fails. Nor can Bartos save this claim simply by arguing that Reisinger's alleged bias against him infected this process in a way which undermined his due process protections. To the extent that Bartos is not challenging the process employed here, but rather is attacking the perceived bias of the decision-maker, Reisinger, it is undisputed that Bartos had the right, and exercised the right, to appeal Reisinger's decision. Where such post-disciplinary appeal rights exist, those appeal rights effectively cure any procedural

due process claims based upon the alleged bias of the initial decision-maker. <u>See</u> <u>Reilly v. City of Atlantic City</u>, 532 F.3ed. 216, 236 (3d Cir. 2008)

In sum, as a procedural matter Bartos received all of the process that was due to him in this setting. Therefore, his procedural due process claim fails and should be dismissed.

### D.    <u>Bartos' "Stigma-Plus" Liberty Claim Also Fails</u>

In his complaint Bartos also advances what is called a "stigma-plus" liberty interest claim, asserting that his discharge on the basis of what he alleges are false claims of racist behavior on his part deprived him of reputational liberty. To the extent that Bartos' complaint makes a Fourteenth Amendment claim based upon an assertion that he was deprived a liberty interest due to the stigma of being fired from his government job, the legal standards which govern such liberty interest claims can be simply stated:

> "[R]eputation *alone* is not an interest protected by the Due Process Clause." <u>Versarge v. Township of Clinton, New Jersey</u>, 984 F.2d 1359, 1371 (3d Cir.1993) (citing <u>Paul v. Davis</u>, 424 U.S. 693, 701-712(1976)) (emphasis added). Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest. <u>Paul v. Davis</u>, 424 U.S. 693, 701(1976). <u>Accord, e.g., Siegert v. Gilley</u>, 500 U.S. 226, 233-234(1991); <u>Edwards v. California Univ. of Pennsylvania</u>, 156 F.3d 488, 492 (3d Cir.1998); <u>Kelly v. Borough of Sayreville,</u> 107 F.3d 1073, 1077-1078 (3d Cir.1997); <u>Ersek</u>, 102 F.3d at

32

> 83 n. 5; <u>Clark v. Township of Falls</u>, 890 F.2d 611, 619-620 (3d Cir.1989); <u>Sturm v. Clark</u>, 835 F.2d 1009, 1012-1013 (3d Cir.1987). We have referred to this as the "stigma-plus" test. <u>See, e.g., Graham</u>, 402 F.3d at 142 n. 2; <u>Ersek</u>, 102 F.3d at 83 n. 5. In the public employment context, the "stigma-plus" test has been applied to mean that when an employer "creates and disseminates a false and defamatory impression about the employee in connection with his termination," it deprives the employee of a protected liberty interest. <u>Codd v. Velger</u>, 429 U.S. 624, 628(1977).The creation and dissemination of a false and defamatory impression is the "stigma," and the termination is the "plus." When such a deprivation occurs, the employee is entitled to a name-clearing hearing.

<u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 236 (3d Cir. 2006). <u>See</u> <u>also</u> <u>Conrad v. Northumberland County</u>, No. 09-1326,  2010 WL 454960, * 6 (M.D.Pa. Feb. 3, 2010).

Furthermore, "[t]o satisfy the 'stigma' prong of the test, it must be alleged that the purportedly stigmatizing statements(s)(1) were made publicly and (2) were false." <u>Hill</u>, 455 F.3d at 236 (internal citations omitted)." <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 235 (3d Cir. 2008). Moreover, the liberty interests protected from harm by in a "stigma-plus" setting can typically be fully vindicated by providing the employee with a "name clearing" hearing, either in an administrative context or in a subsequent criminal trial. <u>Graham v. City of Philadelphia</u>, 402 F.3d 139 (3d Cir. 2005).

In this case, any "stigma-plus" Fourteenth Amendment liberty interest claim made by Bartos fails for a several reasons. First, "[t]o satisfy the 'stigma' prong of the

33

test, it must be alleged that the purportedly stigmatizing statements(s)(1) *were made publicly and (2) were false*." Hill, 455 F.3d at 236 (internal citations omitted)." Dee v. Borough of Dunmore,  549 F.3d 225, 235 (3d Cir. 2008)(emphasis added) Here, Bartos attempts to support this aspect of his "stigma-plus" claim by asserting that: "Bartos has suffered two stigma-plus harms. The first was his termination and the subsequent publication to other DEP staff. The second was the Trespass Notice [issued by DEP in May 2009]." (Doc. 119, p.17.) Yet, upon close examination, neither of these claimed harms will support a "stigma-plus" violation.  At the outset, Bartos' assertion that "his termination and the subsequent publication to other DEP staff" constitutes a stigma-plus harm fails because Bartos has not shown that false information was shared with DEP employees. Bartos suggests that these employees were informed that the Plaintiff was terminated for racist comments and conduct. Bartos supports this claim by citing the deposition testimony of two DEP employees, Donald Hagerich and Patricia Olenick. Yet, neither employee claims to have been told anything about the circumstances surrounding Bartos' discharge. Thus, Hagerich alleges that he was simply informed, "that we didn't need to know why he [Bartos] was terminated." (Doc. 118-13.) Olenick, in turn, simply stated that " Mr. Bartos was fired and I personally was never -- I mean, I didn't know why."  (Doc. 118-14.) Thus, the evidence cited by Bartos does not support his claim that  "stigmatizing

statements(s)(1) were made publicly and (2) were false." <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 235 (3d Cir. 2008). In any event, to the extent that announcing the fact of his termination was stigmatizing, the Defendants offered Bartos a remedy for that stigma, a post-discipline civil service hearing. By providing Bartos with an opportunity for a "name clearing" hearing, <u>Graham v. City of Philadelphia</u>, 402 F.3d 139 (3d Cir. 2005), the liberty interests protected from harm by in a "stigma-plus" setting were fully vindicated here.

Nor can Bartos sustain his stigma-plus liberty interest claim based upon a trespass notice issued by DEP in May 2009. As the Defendants aptly note, this assertion was not pled by Bartos in his complaint, and it is well-settled that a Plaintiff cannot amend a complaint through the filing of a brief, or through arguments set forth in a brief opposing a dispositive motion.  Indeed, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." <u>Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.</u>, 836 F.2d 173, 181 (3d Cir. 1988) (quoting <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984)); <u>cf.</u> <u>Frederico v. Home Depot</u>, 507 F.3d 188, 202 (3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of [a] complaint under Rules 9(b) and 12(b)(6)."). More fundamentally, this assertion cannot save Bartos' complaint because Bartos asserts that this trespass notice was issued in May

35

2009, fifteen months *after* Bartos filed this lawsuit in February, 2008. Since these events are not alleged in the complaint, and had not yet occurred when the complaint was filed, they cannot form the factual basis for this particular claim. Consequently, Bartos' "stigma-plus" liberty interest claim fails.

### E.   Bartos May Not Maintain a Claim Under 42 U.S.C. § 1985(3)

In his complaint Bartos also sues the individual Defendants under 42 U.S.C. § 1985(3), a civil rights conspiracy statute which provides that:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . , the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators

42 U.S.C. § 1985(3).

The reach of § 1985(3) has been carefully defined by the courts. As the United States Court of Appeals for the Third Circuit has observed, "in Griffin v. Breckenridge, 403 U.S. 88(1971) . . . , the Supreme Court clarified that the reach of section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps otherwise class based, invidiously discriminatory animus.' Id. at 102." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997). Thus:

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). In a line of cases . . . , the Supreme Court has made clear what a plaintiff must allege to state a claim under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29,(1983) (citing Griffin, 403 U.S. at 102-03).

Farber v. City of Paterson, 440 F.3d 131, 134 (3d. Cir. 2006). See Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997). "[B]ecause § 1985(3) requires the 'intent to deprive of *equal* protection, or *equal* privileges and immunities,' a claimant must allege 'some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action' in order to state a claim." Id. at 135 (citations omitted, emphasis in original). In practice, "[t]here are two distinct aspects to the 'class-based invidiously discriminatory animus' which, . . ., will support a § 1985(3) claim-the first is defined by form, and the second by function. Thus, a plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." Id. Yet, while proof of class-based discrimination is the gravamen of a § 1985(3) claim, "[t]here are no precise parameters defining the boundaries of 'class' within the meaning of section

1985(3). 'The best that can be said of § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in flux by the Supreme Court.' Trautz v. Weisman, 819 F.Supp. 282, 291 (S.D.N.Y.1993)." Lake v. Arnold, supra, 112 F.3d at 685. Thus, while "a class for purposes of section 1985(3) must be 'something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors,'"the courts have "strictly construed" what constitutes a class under this civil rights statute. Id. Adopting this strict construction of class-based discrimination under § 1985(3), Courts have repeatedly held that whistle-blowers do not constitute a "class" protected by this particular civil rights statute. See e.g., Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 802 (3d Cir. 2010); Childree v. UAP/GA AGChem., 92 F.3d 1140, 1147(11th Cir. 1996); Hicks v. Resolution Trust Corp., 970 F.2d 378, 382 (7th Cir. 1992);.Deubert v. Gulf Federal Savings Bank, 820 F.2d 754, 757 (5th Cir. 1987); Deretich v. Office of AdministrativeHearings,798 F.2d 1147, 1153 (8th Cir. 1986); Buschi v. Kirven, 775 F.2d 1240, 1258 (4th Cir. 1985).

In sum, proof of; (1) a conspiracy; (2) motivated by class-based animus is the essence of a § 1985(3) claim. Here, Bartos fails in his proof of both of these essential elements. At the outset, Bartos has not shown evidence of the existence of a conspiracy between McGinty, McDonnell, and Reisinger to deprive him of his civil

rights. Indeed, we have already found Bartos' proof wanting as to McGinty and McDonnell, who were often supportive of Bartos, and in no event were shown to have taken action against motivated by some class-based bias. With the claims against these Defendants dismissed, Bartos' proof of a conspiracy–which requires multiple members–simply fails since the only remaining Defendant is Reisinger, who cannot conspire with himself.

More fundamentally, Bartos' § 1985(3) claim fails because he has not shown that any Defendant acted against him because of some class-based animus. In this regard, Bartos make two equally unavailing class claims. First, he alleges that the Defendants were motivated by a bias against whistle-blowers. However, this assertion fails as a § 1985(3) claim because Courts have repeatedly held that whistle-blowers do not constitute a "class" protected by this statute. See e.g., Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 802 (3d Cir. 2010); Childree v. UAP/GA AGChem., 92 F.3d 1140, 1147(11th Cir. 1996).

Bartos then endeavors to make a "class of one" claim on behalf of himself as a singular class comprised of one person. The legal standard to be applied when examining such a claim has been defined by the United States Court of Appeals for the Third Circuit in the following terms:

39

> The Supreme Court has held that a " 'class of one' " can attack intentionally different treatment if it is " 'irrational and wholly arbitrary.' " Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal citations omitted) (per curiam). . . . The "irrational and wholly arbitrary" standard is doubtless difficult for a plaintiff to meet . . . , id. at 565-66 (Breyer, J., concurring), and we do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation. [Therefore][i]t may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach.

Eichenlaub v. Township of Indiana, supra, 385 F.3d at 286-87.

This case aptly illustrates why it is "very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach." Id. Indeed, the same considerations that led us to conclude that the actions of the Defendants satisfied the requirements of due process, also lead us to conclude that those actions were not " 'irrational and wholly arbitrary,' " Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), the legal benchmark which defines a valid equal protection claim in this context.

While Bartos may attack this process on other grounds, it cannot be said that this agency decision was so lacking in procedural safeguards that it was "irrational and wholly arbitrary," the benchmark for a class-of-one claim. Quite the contrary, here the procedural protections provided to Bartos fully satisfied these constitutional standards. In each instance, Bartos was given advance notice of the hearing. He was

notified of the charges made against him. He was allowed the assistance of counsel. He was given an opportunity to respond to those charges, and present evidence on his own behalf. When adverse decisions were made against him, Bartos was provided with written notice of those decisions, and was specifically informed of his appeal rights. Bartos then actively exercised those rights, and sought further review of these workplace discipline decisions. Given these procedural protections afforded to Bartos, this class of one claim fails, and since § 1985(3) requires proof of a class-based bias against some clearly defined and specifically identifiable class of people, Bartos' § 1985(3) claim fails as well.

### F.    Bartos' Fair Labor Standards Act Claim Fails

In Count V of his complaint Bartos makes a claim under the Fair labor Standards Act ("FLSA"), 29 U.S.C. § 201. Bartos' FLSA claim seems to have shifted its shape, form and substance over time. As initially set forth in this complaint, the nature of this claim was straightforward: Bartos alleged that he was not an exempt employee under the FLSA, and worked overtime without compensation, in violation of the FLSA. (Doc. 1, ¶¶ 143-146.)

The Defendants responded to this assertion by arguing that Bartos was exempt from the requirements of the FLSA because he was an administrative employee. An employee working in an administrative capacity is exempt from the FLSA overtime

requirements. <u>See Smith v. Johnson & Johnson</u>, 593 F.3d 280, 284-85 (3d Cir. 2010)(citing 29 U.S.C. §213(a)(1)). An administrative employee is defined as someone: (1) compensated on a salary or fee basis at a rate of not less than $ 455 per week ... exclusive of board, lodging or other facilities; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. <u>Id</u>. (citing 29 C.F.R. §541.200). Judged against these benchmarks, there is little doubt that Bartos had held administrative employee positions at DEP for many years prior to the disciplinary action which forms the basis of this lawsuit. He would, therefore, have been exempt from the FLSA's over-time requirements.

While he does not contest the general characterization of Bartos as an exempt administrative employee, the Plaintiff now advances a new, different and much more elaborate theory of FSLA liability in his pleadings. Bartos now seems to concede that he was once an exempt administrative employee, but argues that the Defendants' 2007 disciplinary actions effectively stripped away this exemption. To support this proposition Bartos cites a Department of Labor regulation which permits discipline of exempt employees, as proof that the Defendants have forfeited this exemption. 29

C.F.R. §541.602(b)(5). This regulation states that: "[d]eductions from pay of exempt employees may be made for unpaid disciplinary suspensions of one or more full days imposed in good faith for infractions of workplace conduct rules."   29 C.F.R. §541.602(b)(5). Arguing that this particular disciplinary action was conducted in bad faith, Bartos contends that the bad-faith nature of this disciplinary decision removes the disciplinary action from this regulatory safe-harbor permitting discipline of administrative employees under the FSLA, and effectively also strips away this entire FLSA exemption. (Doc. 119, pp.31-33.)

There are two problems with this assertion. First, Bartos' claims on summary judgment now differ from the averments in his complaint. It is well-settled that a plaintiff cannot amend a complaint through the filing of a brief, or through arguments set forth in a brief opposing a dispositive motion.  Indeed, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." Pennsylvania ex rel. Zimmerman v. Pepsico, Inc., 836 F.2d 173, 181 (3d Cir. 1988) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984)); cf. Frederico v. Home Depot, 507 F.3d 188, 202 (3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of [a] complaint under Rules 9(b) and 12(b)(6).") Therefore, Bartos may not transform and modify his theory of litigation on this FSLA claim at this time, in this fashion.

In any event, the disciplinary regulation cited by Bartos does not appear to have the broad effect which he ascribes to it. Quite the contrary, the reach of this regulation is limited, in turn, by another regulation, 29 C.F.R. § 603, which provides that an alleged isolated improper disciplinary pay deduction will not strip away this administrative employee exemption under the FSLA, particularly when the employing agency provides an appeal process to employees which enables them to challenge any disciplinary actions. 29 C.F.R. § 603. Here, it is undisputed that such an appellate process existed. (Doc. 110-4, Ex. 22.) Moreover, we find that Bartos' assertions that this particular discipline was undertaken in bad faith, at most, states an isolated instance and does not describe a claim of an on-going agency practice that would defeat this regulatory exemption to administrative employees under the FLSA.

### G.   Bartos' Has Stated a First Amendment Retaliation Claim Which Survives Summary Judgment

While we have found that a number of Bartos' claims fail, we conclude that Bartos has stated a First Amendment retaliation claim in this case against Defendant Reisinger which should survive a motion for summary judgment. To advance such a First Amendment claim, Bartos must make a three-part showing.

> To make out a *prima facie* case, [a plaintiff] must show that (1) []he was employed at a public agency in a position that does not require political affiliation, (2) []he was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the

44

government's employment decision. See, e.g., Stephens, 122 F.3d at 176. Once []he makes this demonstration, the [defendants] may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." Id.; see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007). See also Bell v. City of Philadelphia, 275 F. App'x 157 (3d Cir. 2008); Kougher v. Burd, 274 F. App'x 197 (3d Cir. 2008); McKee v. Hart, 436 F.3d 165 (3d Cir. 2006); Brown v. Armenti, 247 F.3d 69 (3d Cir. 2001).Where a plaintiff fails as a matter of law to sustain his burden of proof on any of these elements of a First Amendment claim, defendants are entitled to judgment in their favor as a matter of law. Id.

In this case, it is apparent that Bartos was a public employee. Furthermore, Bartos' filing of a complaint with the civil service commission would be a constitutionally protected activity since "[i]t is undisputed that filing lawsuits and grievances under a collective bargaining agreement implicate the Petition Clause of the First Amendment. San Filippo v. Bongiovanni, 30 F.3d 424, 434-35 (3d Cir.1994)." Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003). Thus, the first two elements of a First Amendment claim are satisfied. Moreover, as to the third element of a First Amendment retaliation claim–a showing that First Amendment activities were a substantial or motivating factor in the decision to terminate him–disputed

factual issues preclude summary judgement for Defendant Reisinger. It is well-settled that:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir.2000).

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

While we are specifically admonished that "[a] court must be diligent in enforcing these causation requirements, Id. at 267-68, here we find that the evidence, while hotly disputed, would permit such a finding when construed "in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007). Construing the disputed evidence in favor of Bartos, as we are required to do, that evidence would show that Reisinger attempted to dissuade Bartos from exercising his administrative appeal rights when he notified Bartos of his disciplinary decision, and that Reisinger further endeavored to discourage Bartos from pursuing his concerns about the Section 902 program funding. When Bartos asserted his appellate rights, filed a grievance, and claimed

whistle-blower status, a series of disciplinary decisions were made by Reisinger which culminated in Bartos' discharge. These facts, if believed would permit a finding of retaliation both through "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, [and] (2) [through] a pattern of antagonism coupled with timing to establish a causal link."Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Reisinger vigorously challenges Bartos' claims, arguing with great force that these decisions were solely motivated by Bartos' discriminatory conduct in the Fall of 2007. Bartos replies with equal force to this defense,  insisting that Reisinger's stated rationale was a mere pretext for Reisinger's own act of discriminatory retaliation against Bartos. Both claims are pursued with equal conviction and passion. Both claims turn on issues of motivation and intent. Moreover, both claims require consideration of competing testimony, consideration that entails assessment of witness credibility in a factual landscape where witness credibility issues abound. Thus, the parties' competing arguments demonstrate that the question of whether this discharge was based on Bartos' acts of discrimination, or reflected acts of discrimination against Bartos, is a factual issue which cannot be resolved through a motion for summary judgment but must be determined at trial.

**H.**     **Bartos' State Law Whistle-Blower Claim Against Defendant Reisinger Should Also Survive Summary Judgment**

The considerations which compel us to recommend that the Court deny the Defendants' summary judgment motion on Bartos' First Amendment retaliation claim also calls for denial of summary judgment on Count VI of Bartos' complaint, which alleges a violation of Pennsylvania's Whistle-Blower Statute, 43 Pa.C.S. § 1421, et seq. This statute provides, in part, that:

> **Persons not to be discharged.--**No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 Pa.C.S. § 1423(a).

The Pennsylvania Whistle-blower Act was "enacted to protect public employees 'who report a violation or suspected violation of State, local or Federal law' or who 'participate in hearings, investigations, legislative inquiries or court actions' from being discharged as a result of such activity. 43 Pa. Const.Stat.Ann. § 1421 (Historical and Statutory Notes). To establish a cause of action for retaliatory discharge under the Law, the public employee must allege that prior to discharge, he made a good faith report of his employer's waste or wrongdoing to the appropriate

48

authorities, and was discharged in reprisal for that report. <u>Lutz v. Springettsbury Township</u>, 667 A.2d 251 (Pa.Cmwlth.1995)." <u>Jakomas v. McFalls</u>,  229 F.Supp.2d 412, 421 (W.D.Pa. 2002). The causal element of reprisal against an employee for reporting alleged waste, fraud or abuse can often be shown by "facts or surrounding circumstances that the report led to their dismissal, such as that there was specific direction or information the [employee] received not to file the report or there would be adverse consequences because the report was filed." <u>Gray v. Hafer</u>, 651 A.2d 221, 225 (Pa.Cmwlth.1994). Where there are disputed factual issues relating to causation, and whether an employment action was taken in reprisal for whistle-blowing activity, a complaint under the Pennsylvania Whistle-blower Statute is not subject to dismissal on summary judgment. <u>Dennison v. Dep't of Corrections</u>, 268 F.Supp.2d 387 (M.D. Pa. 2003).

In this case, Bartos has presented a disputed account of events, but an account which–if credited–would tie Reisinger's actions to Bartos' whistle-blowing activities. In fact, Bartos' statements, if believed, directly link the two events since Bartos alleges that Reisinger attempted to dissuade him from further reporting activity when he first disciplined Bartos, and then fired Bartos when he did not comply with this request. These assertions, if accepted by a fact-finder would permit a reasonable inference that Bartos received "specific direction or information . . . not to [pursue

his] report or there would be adverse consequences . . . ." <u>Gray v. Hafer</u>, 651 A.2d 221, 225 (Pa.Cmwlth.1994) While Reisinger has amassed substantial proof challenging this assertion that his discharge of Bartos was pretextual, that proof does not dispel a factual issue, and permit summary judgment. Rather, it defines a factual question which must be resolved by trial. Therefore, Bartos' state whistle-blower act claims against his supervisor, Reisinger, and the agency that employed him, should be found to withstand summary judgment.[5]

## I.   <u>Reisinger is Not Entitled to Qualified Immunity</u>

Finally, we find that Reisinger is not entitled to qualified immunity on these remaining, disputed claims. While Reisinger has argued with great force that his actions were proper and lawful, in the final analysis, a determination of this question turns on issues of motivation, and whether the justification for Reisinger's action in disciplining Bartos was pretextual. When confronting a claim of qualified immunity which is premised upon factual disputes regarding human motivation we are reminded that: "Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury. <u>See Johnson v. Jones</u>, 515 U.S. 304, 313, 115 S.Ct. 2151,

---

[5]Bartos had also leveled claims against Defendants McGinty and McDonnell under the Whistle-blower act, but as we have noted, his proof of culpable misconduct by these Defendants is wholly wanting. Therefore, this claim should be dismissed as to these Defendants.

132 L.Ed.2d 238 (1995) (qualified immunity may turn on disputed issues of fact); Karnes v. Skrutski, 62 F.3d 485, 491 (3d Cir.1995) ("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."). Motive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor. See Mitchell v. Forsyth, 472 U.S. 511, 529, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (improper intent is a pure question of fact); Walker v. Horn, 286 F.3d 705, 710 (3d Cir.2002)." Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir. 2006).

Since "motive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor", id., the profound, and profoundly factual, dispute between Reisinger and Bartos regarding these matters precludes summary judgment for Reisinger on qualified immunity grounds.

## IV. **Recommendation**

For the foregoing reasons it is recommended as follows:

51

1.     Summary judgment be entered in favor of Defendants McGinty and

       McDonnell on all claims.

2.     Summary judgment be entered in favor of Defendant Reisinger on

       Bartos' procedural due process claims, Fair Labor Standard Act claims,

       "stigma-plus" liberty interest claims, and Bartos' claims under 42 U.S.C.

       § 1985(3).

3.     Disputed issues of material fact preclude summary judgment on Bartos'

       First Amendment retaliation claim against Defendant Reisinger and

       Bartos' state whistle-blower statute claims against Defendants Reisinger

       and Department of Environmental Protection.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the

magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions

Submitted this 25th day of May, 2011.

<u>**S/Martin C. Carlson**</u>
Martin C. Carlson
United States Magistrate Judge